profit per day of $40.60, the total loss of profits was $4,587.80.

*Interest*

Plaintiff seeks prejudgment interest on its award. In admiralty this is a matter in the court's sound discretion. The Umbria, 166 U.S. 404, 421, 17 S.Ct. 610, 41 L.Ed. 1053. The court has reviewed the docket entries in this case, and finds no evidence of dilatory activity by defendants. The defenses were not frivolous and in all the circumstances prejudgment interest does not appear warranted in this case. See Port City Barge Lines, Inc. v. St. Louis Grain Corp., and Wood River Harbor Service, E.D.Mo.; Regan, J., Cause No. 69A 548(3).

*Conclusion*

The foregoing constitutes the court's findings of fact and conclusions of law. In summary, the court finds and concludes that plaintiff is entitled to recover from defendants the sum of $125,075.00 plus $4,587.80 for loss of use, with interest thereon to run from date of judgment. The Clerk will enter judgment accordingly.

So ordered.

**Leo P. McCURNIN, Jr., Plaintiff,**

v.

**KOHLMEYER & COMPANY and Jack D. Drake, Defendants.**

**Civ. A. No. 71–2138.**

United States District Court,
E. D. Louisiana.

Aug. 17, 1972.

Peter G. Burke, Paul M. Haygood, New Orleans, La., for plaintiff.

Charles Kohlmeyer, Jr., Earl S. Eichin, Jr., New Orleans, La., for defendants.

ALVIN B. RUBIN, District Judge:

McCurnin, a businessman, placed an order with Kohlmeyer, a stock and commodities broker, through Drake, Kohlmeyer's customer's representative, to buy 15 contracts for cotton futures at a price not to exceed 33.30 per pound. Later the same day, in violation of his instructions, Drake cancelled the orders that he had entered at 33.30, and placed new orders at a price of 34.10. The orders were executed at that price. Drake did this under the mistaken belief that McCurnin definitely wanted to purchase cotton that day even at a slightly higher price, and that cotton futures would continue to advance.

A short while later McCurnin, who was out of town, telephoned Drake and learned what had been done. As soon as he returned to New Orleans, still later on the same day, McCurnin went to Drake's office and expressed his displeasure. He asked what he could do about the purchase. In fact McCurnin had the right to reject the purchase. La.C.C. 3010. Drake did not know this, and told McCurnin nothing could be done; but he expressed his optimism about the upward movement of cotton futures, and persuaded McCurnin that there was a possibility of profit in the transaction.

The next day, when the market opened lower, McCurnin again expressed concern about the purchase and Drake again attempted to reassure him. McCurnin nonetheless delivered checks to cover margin requirements on the 15 contracts. By the following day, May 27, 1971, it was evident that the market would continue to fall. McCurnin conferred with Drake's supervisor, Tidmore, and was informed that he could have rejected the purchase had he done

so when he first learned of it. Tidmore rebuked McCurnin for not knowing the rules, and told McCurnin that, in order to determine what relief, if any, Kohlmeyer would afford him, he must liquidate his position. McCurnin did so, at a loss of $26,725. He now seeks to recover $15,286.45 McCurnin's credit balance at the time of the loss, from Kohlmeyer and Drake. The defendant Kohlmeyer has counterclaimed for $11,438.55, the amount remaining due if McCurnin is responsible for the loss.

Drake had no intention to mislead, cheat or defraud McCurnin. He acted out of the ingenuous supposition that McCurnin really wanted to be "in cotton" and the erroneous belief that the price was advancing.

## I. COMMODITIES EXCHANGE ACT CLAIMS

It is contended that Drake's conduct violated Section 6b of the Commodities Exchange Act,[1] 7 U.S.C.A. § 6b, which reads in part as follows:

"It shall be unlawful (1) for any member of a contract market . . . in connection with . . . any contract of sale of any commodity . . . for future delivery . . .

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) wilfully to make or cause to be made to such other person any false report or statement thereof . . . .;

(C) wilfully to deceive or attempt to deceive such other person . . . ."

That section is clearly directed only toward wilful misconduct. It cannot be rewritten into a mandate of "a philosophy of full disclosure" by chopping it into fine pieces as part of a stew composed of mingled bits of the Securities Act of 1933, the Securities Exchange Act of 1934, the Public Utility Holding Company Act of 1935, and the Investment Company Act of 1940, as plaintiff's counsel seeks to do. The Securi-

---

1. Kohlmeyer is of course responsible for the acts of its agents including Drake's. 7 U.S.C. § 4.

ties Exchange Act of 1934, for example, employs much broader language, forbidding "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." Section 10(b), 15 U.S.C.A. § 78j(b). The regulations, Rule 10–b–5, elaborate on what is forbidden. There is no counterpart of Section 10(b) in the C.E.A., nor any counterpart of Rule 10–b–5 in the Commodities Act regulations.

Nor is it either good logic or good law to assert that, because Section 6b was proposed in order "to insure fair practice and honest dealing in the commodity exchanges," (see Report of the Committee on Agriculture, House of Representatives, Report 421, 74th Congress), the C.E.A. was ipso facto amended thereby to require everything of commodity brokers that might be embraced within the concepts of "fairness" and "honesty." Counsel have pointed to no provision of the Act nor to any regulation that prescribes any penalties for a broker's honest error.

The C.E.A. does not use sweeping terms. Its pejoratives are simple and pointed: it uses the words "cheat" and "defraud" and "wilfully." By any definition these connote deliberate acts or a degree of negligence that is so gross as to approach wilfulness. This interpretation is strengthened by the fact that criminal penalties are attached to a violation of Section 6b, 7 U.S.C. § 13. Such penalties are not usually attached to good faith actions merely because they are negligent or uninformed. Nor did Congress in the C.E.A. employ any general prohibitions against untrue statements of material facts or omissions to state material facts such as those found in the Securities Act of 1933. 15 U.S.C. § 77a et seq.

For purposes of this case it is unnecessary to explore the full reach of Section 6b. It is sufficient to determine that it does not extend either to the act of an agent who purchases a commodity for his principal at a price in excess of his authority without intent to cheat or defraud, or to the agent's innocent albeit negligent lack of familiarity with his principal's remedies thereafter.

## II. SECURITIES ACT CLAIMS

■ Although *McCurnin* alleged violations of the Securities Act and the Securities Exchange Act, all of his claims under these laws were dismissed by opinion on March 10, 1972, D.C., 340 F. Supp. 1338, on motion for summary judgment, save one relating to the application of the balance in McCurnin's securities account to pay the loss resulting from commodities transactions. There has been no showing of any improper act in this connection; indeed there has been no real claim of impropriety. The sole claim is that, because funds in a securities account were applied to pay a debt incurred in a commodities transaction, the Securities Act should retroactively apply to whatever occurred before that time in connection with the commodities transactions. No authority has been cited for this unusual doctrine, which smacks something of a quasi bill of attainder of commodities transactions by virtue of later association with a securities account.

■ Finally, it is unnecessary to dwell at length on the proposition that Kohlmeyer's conduct may have violated some rule of the New York Stock Exchange, hence McCurnin can recover damages. The authority is of course clearly to the contrary. Colonial Realty Corp. v. Bache & Co., 2d Cir. 1966, 358 F.2d 178; cf. Buttrey v. Merrill Lynch, 7 Cir. 1969, 410 F.2d 135 (a knowing and callous disregard for exchange rules gives rise to civil liability).

## III. PENDENT JURISDICTION

■ What remains is a suit between two Louisiana residents based on an alleged violation of the Louisiana law of agency. But this result has been reached only after a full trial without a jury, at which all of the evidence necessary to decide the state as well as the federal claims was introduced.

This court would ordinarily have no jurisdiction of these claims, but their joinder with a claim arising under federal law provides pendent jurisdiction. United Mine Workers v. Gibbs, 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. See full discussion in 3A Moore's Federal Practice ¶ 18.07 [1.–3] et seq. The power to adjudicate a claim by virtue of pendent jurisdiction "need not be exercised in every case in which it is found to exist."

It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them . . . . Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals. There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong. U.M.W. v. Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139.

These considerations weigh toward the court's assuming jurisdiction of, and deciding the issues of state law. The federal question was not "unsubstantial and frivolous." See Elberti v. Kunsman, 3 Cir. 1967, 376 F.2d 567. The state claims arise not only "from a . . .

nucleus of operative facts" common to the federal ones, United Mine Workers v. Gibbs, supra, 383 U.S. at 725, 86 S.Ct. at 1138, but indeed, as in Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, from the identical facts on which the federal remedies were sought. The case has been fully tried. It is in the interest of justice, as well as of judicial economy, that the issue be decided on what is already a complete record. See discussion in Sauls v. Hutto, E.D., La.1969, 304 F.Supp. 124 at 126–128. While counsel cannot bestow jurisdiction by consent, they have both indicated to the court that they do not consider it in the interests of justice for the case to be tried again in state court. For these reasons, the state claims will be determined.

## IV.  LOUISIANA LAW OF MANDATE

What is termed agency at common law is dealt with as mandate by the Louisiana Civil Code. Article 3010 of that Code provides:

> "The attorney can not go beyond the limits of his procuration; whatever he does exceeding his power is null and void with regard to the principal, unless ratified by the latter, and the attorney is alone bound by it in his individual capacity."

In addition the mandatary is responsible for negligence in carrying out his duties, for Article 3003, Louisiana Civil Code, provides:

> "The attorney is responsible, not only for unfaithfulness in his management, but also for his fault or neglect . . . ."

Where an agent entrusted with the duty to purchase merchandise for his principal deviates from the order placed in price, quantity or kind, "the articles must remain in his own account." Lowe and Pattison v. Bell and McLay, 1851, 6 La.Ann. 28. There can be no doubt here that, through Drake, Kohlmeyer, as McCurnin's agent, violated the instructions expressly given Drake.

But it is asserted that McCurnin thereafter ratified the purchase because: (a) he was informed of the 34.10 price by Drake when he telephoned Drake from Atlanta on May 25; (b) he was again informed of the 34.10 price when he came to the Metairie office of Kohlmeyer that afternoon; (c) he knew of the 34.10 price when he executed the customer's agreement and commodity cards for the McCurnin & Swan account that day; (d) he knew of the 34.10 price when he delivered the $7,500 margin check to Kohlmeyer the next day; and (e) he failed to repudiate the purchases.

The conclusion that McCurnin failed to repudiate is mistaken. McCurnin had manifested his displeasure to Drake. He had been informed—misinformed—by Drake that there was nothing he could do but complete the transaction. It is true that Drake's optimism about the market had made both McCurnin and Drake sanguine that all might turn out well, but this false hope was never transmuted by McCurnin into approval of Drake's actions.

■ The burden of proving ratification is on the defendants. O. E. Haring, Inc. v. Boylan's Private Police, La.App., Orl.Cir. 1952, 56 So.2d 588; Monroe Milk Station, Inc. v. Sur-Wa Stores, La. App., 2d Cir. 1936, 167 So. 771. An intention to ratify an unauthorized act will not be inferred when the act can be otherwise explained. The benefit of doubt accrues to him against whom ratification is claimed. International Accountants Society v. Santana, 1928, 166 La. 671, 117 So. 768.

■ Thus, though a principal may acquiesce in the actions of an agent and even take positive actions that are consistent with ratification of the agent's action, where this occurs because of a mistaken belief by the principal that he is legally bound by the action of the agent, there is no ratification, since ratification requires knowledge on the part of the principal. See Jordan v. Smith, 1944, 206 La. 765, 20 So.2d 17, 19. For ratification to be implied, "it must be shown that the principal actually had knowledge of the material and pertinent facts." Id. at 19. Here McCurnin did "not sit back with wet finger to the wind and then deny his agent's authority." Manufacturers Casualty Ins. Co. v. Martin-Lebreton Ins. Agency, E.D.La. 1956, 144 F.Supp. 515, 517, rev'd on other grounds, 5 Cir. 1957, 242 F.2d 951. He told Drake of his desires on the very day the transaction was made.

Drake violated not only Civil Code Article 3010, but also Article 3003, for it was his duty to advise his customer correctly when the customer inquired about the unauthorized contract. In this respect, as in most aspects of agency, Louisiana law conforms to the prevailing American doctrine, as set forth in the Restatement of Agency, 2d, § 379:

Unless otherwise agreed, a paid agent is subject to a duty to the principal to act with standard care and with the skill which is standard in the locality for the kind of work which he is employed to perform and, in addition, to exercise any special skill that he has.

The Comment on Subsection 1, comment c. is pertinent:

The paid agent is subject to a duty to exercise at least the skill which he represents himself as having. Unless the circumstances indicate otherwise, a paid agent represents that he has at least the skill and undertakes to exercise the care which is standard for that kind of employment in the community. A business agent represents that he understands the usages of the business and undertakes to conduct transactions in accordance with them; one undertaking a matter involving special knowledge represents that he has the special knowledge required.

■ One dealing with a commodity broker is entitled to expect him to know the rules of the exchange and of the trade. Drake and Tidmore held themselves out, and were held out by Kohlmeyer, as qualified brokers. It was

their duty to inform McCurnin, not his to second guess them.

Ratification is defined as the "affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Restatement of Agency, 2d, § 82. "Affirmance is either manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or conduct by him justifiable only if there were such an election." Restatement of Agency 2d, § 83.

Such an affirmance is established only by "conduct of the purported principal manifesting that he consents to be a party to the transaction or by conduct justifiable only if there is ratification." Restatement of Agency 2d, § 93. Here there was no such manifestation of consent, only compliance with what Drake told McCurnin he must do.

■ Of course, affirmance can be inferred from a failure to repudiate a transaction. Restatement of Agency 2d, § 94. But this is only where silence would justify an inference of assent. There was no such silence by McCurnin, no such assent.

It is unnecessary to distinguish in detail each of the cases cited by defendant. Most deal with the situation where a third person who dealt with an agent was unaware that the agent had exceeded his authority, the principal failed to disclaim the agent's actions, and hence was held to have ratified them. See, for example, Ledoux v. Old Republic Life Ins. Co., La.App., 3 Cir. 1970, 233 So.2d 731; McNeely v. Dave Lumber Co., 2 Cir. 1931, 18 La.App. 672(3), 137 So. 607; cf. Beaumont Bldg. Material Co. v. Barbe, 1 Cir. 1930, 13 La.App. 335, 127 So. 484. There are two reported Louisiana cases where the principal unsuccessfully sought to shift the loss from an agent's unauthorized acts to the agent. In these cases the court held that, where the principal, with full knowledge of all the consequences, adopts the agent's acts, he will be bound by them. In one case, the principal waited five years to attempt to escape from the implication drawn from silence, Oliver v. Johnson, 1872, 24 La.Ann. 460, and in the other several months. Kehlor, Updike & Coe v. Kemble, Hastings & Co., 1874, 26 La. Ann. 713. See also Comment, 5 La.L. Rev. 308, 314 (1943) dealing with the effect of failure to repudiate within a reasonable time. Here McCurnin acted on the day he became aware of the transaction; his attempt to repudiate was defeated by Drake.

■ Nor can any estoppel be found. Equitable estoppel arises only "when one by his actions, or by his silence when he ought to speak, induces another to believe certain facts and the other relies on these facts to his prejudice." Ledoux v. Old Republic Life Ins. Co., La.App., 3 Cir. 1970, 233 So.2d 731. McCurnin neither misled Kohlmeyer by his failure to speak nor induced Kohlmeyer to believe facts that Kohlmeyer relied on to its detriment. Kohlmeyer did not change position in reliance on McCurnin's representations. Janney v. Calmes, 1948, 212 La. 756, 33 So.2d 510; American Bank v. Trinity Universal Insurance, La.App.1966, 194 So.2d 164, 251 La. 445, 205 So.2d 35. See also Restatement of Agency 2d, § 8(b).

## V. DAMAGES

■ McCurnin did owe Kohlmeyer the duty to minimize his damages. Royal Air Properties, Inc. v. Smith, 9 Cir. 1962, 312 F.2d 210, 213–214. Cf. Hecht v. Harris, Upham & Co., N.D.Calif.1968, 283 F.Supp. 417, 428–430; mod. in part, 9 Cir. 1970, 430 F.2d 1202. But he acted with reasonable promptness to do so —within 3 days after the wrongful act was done.

■ McCurnin was faced with what Drake told him was a certain loss. He waited overnight, buoyed by Drake's reassurances. The next day he complained again to Drake. Drake took him to Tidmore. Then McCurnin learned for the

first time that Kohlmeyer expected him to liquidate his position before it would consider his problem. McCurnin immediately instructed that his contracts be sold. They could not be sold at once, and the loss resulted when a buyer was found. Under the facts, there is but one reasonable conclusion: the loss must be Kohlmeyer's, not McCurnin's. Compare Unverzagt v. Young Builders, Inc., 1968, 252 La. 1091, 215 So.2d 823, finding no duty to mitigate where the defaulting party had the same opportunity and knowledge as the injured one.

For these reasons, judgment will be entered in favor of plaintiff and against defendants for the sum of $15,286.45 plus costs, together with interest from July 29, 1971, until paid.