586 F.2d 1352
 MASTER COMMODITIES, INC., Plaintiff-Counter-Defendant-Appellant,
v.
TEXAS CATTLE MANAGEMENT CO., Defendant.
CATTLE RESOURCES PARTNERSHIP-1974,
Defendant-Counter-Plaintiff and Third Party
Plaintiff-Appellee,
v.
RUFENACHT, BROMAGEN & HERTZ, INC., Third Party Defendant-Appellant.
 Nos. 76-2137, 76-2138.
 United States Court of Appeals,
Tenth Circuit.
 Argued March 16, 1978.
Decided Nov. 7, 1978.
Rehearing Denied Dec. 21, 1978.
 
 Ben L. Krage, Dallas, Tex. (Alan H. Cooper, Dallas, Tex., with him on the brief), of Kasmir, Willingham & Krage, Dallas, Tex., for appellant Master Commodities, Inc.
 Daniel W. Weil, Chicago, Ill. (Neil E. Holmen, Chicago, Ill., with him on the brief), of Winston & Strawn, Chicago, Ill., for appellant Rufenacht, Bromagen & Hertz, Inc.
 Don M. Dean of Underwood, Wilson, Sutton, Berry, Stein & Johnson, Amarillo, Tex. (Harry A. Woods, Jr., of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., with him on the brief), for appellee Cattle Resources Partnership-1974.
 Before McWILLIAMS, BARRETT and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 This is a civil suit brought by appellant Master Commodities, Inc. against appellee Cattle Resources Partnership-1974 (CRP-74) and its agent Texas Cattle Management Company (TCM), to collect a deficit balance in a commodities futures trading account that TCM opened on behalf of CRP-74 and maintained through Master Commodities. The suit was removed from an Oklahoma state court to the United States District Court for the Western District of Oklahoma under the diversity statute.
 
 
 2
 Thereafter CRP-74 answered, counterclaimed against Master Commodities, and impleaded appellant Refenacht, Bromagen & Hertz, Inc. (RB&H) as a codefendant on the counterclaim. (Master Commodities is an associate broker, placing its customer trades through RB&H which is a clearing member of the Chicago Mercantile Exchange.) In its amended counterclaim CRP-74 sought damages against Master Commodities and RB&H based upon general agency principles, for violation of The Commodities Exchange Act, regulations promulgated under that Act, Rule 942 of the Chicago Mercantile Exchange, conspiracy and fraud. CRP-74 further alleged that Master Commodities and RB&H knowingly and willfully applied funds belonging to CRP-74 to a debt owed personally by TCM's President James Layton Hughens (Hughens).
 
 
 3
 TCM eventually defaulted. The remaining parties tried the case to the court without a jury in September 1976. The district judge announced a decision from the bench, making oral findings of fact, which he thereafter embodied into written findings of fact and conclusions of law. The court awarded Master Commodities default judgment against TCM on its claim for $19,415, denied recovery against CRP-74 and awarded no attorney's fees. CRP-74 was awarded $55,750 damages and $15,000 attorney's fees against Master Commodities and RB&H jointly and severally on CRP-74's counterclaim. The court also awarded CRP-74 $13,000 against RB&H for applying CRP-74 funds to pay Hughens' debt. RB&H and Master Commodities appealed the adverse money judgments to this court.
 
 
 4
 On appeal Master Commodities and RB&H challenge the trial court's findings as contrary to the evidence and the law. Specifically, appellants contend fraud is required to violate the Commodities Exchange Act and the federal and local commodities regulations; that under the principles of agency law CRP-74 ratified TCM's actions and clothed TCM with apparent authority to act as it did; and that appellee CRP-74 should not have been awarded attorney's fees. RB&H challenges the award against it for conversion of CRP-74 funds.
 
 
 5
 Since the facts are complicated we will develop them as they are pertinent to a discussion of the legal questions which must be resolved in this case.
 
 
 6
 * Despite arguments of appellants to the contrary, in his oral findings the trial judge appears to rely both upon general agency principles and a violation of statute and rules and regulations in arriving at his conclusions. "(I)n my opinion, not only common decency, but the rules and regulations . . . required that the information be obtained as to the true owners who owned those futures . . . and the Master Commodities people and RB&H wholly failed to even make a token effort to comply with that rule . . ." (R. 607)
 
 
 7
 The same is true in his written conclusion of law # 5.
 
 
 8
 RB&H and Master Commodities breached their duty to make inquiry as to the scope of authority of CRP's agent and further violated the provisions of the Commodities Exchange Act, the Regulations of the Commodities Exchange Administration and the Chicago Mercantile Exchange concerning controlled or managed accounts, including but not limited to, Rule 942, thereby directly and proximately causing damage to CRP in the amount of $55,750.00.
 
 
 9
 We treat first the issue of whether the trial court could properly conclude Master Commodities and RB&H were liable for damages under the Commodity Exchange Act, 7 U.S.C. § 6b, related regulations found at 17 C.F.R. §§ 1.33a and 1.37, and Rule 942 of the Chicago Mercantile Exchange. We assume for this case that a private right of action exists under the Commodity Exchange Act, although appellants contend otherwise. See Goodman v. H. Hentz & Co., 265 F.Supp. 440 (N.D.Ill.1967). The key question is whether recovery must be based on fraud or willful conduct, and not mere negligence, mistake or inadvertence.
 
 
 10
 The statutory scheme under 7 U.S.C. § 6b is plainly phrased in terms of fraudulent or willful conduct.
 
 
 11
 It shall be unlawful . . .
 
 
 12
 (A) to cheat or defraud or attempt to cheat or defraud such other person;
 
 
 13
 (B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
 
 
 14
 (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract . . ..
 
 
 15
 The private right of action under § 6b is implied by courts from the statutory intent and that seems clearly aimed at intentionally deceptive conduct. Only a few courts have discussed the issue, but every such decision requires some form of purposively misleading conduct. Booth v. Peavey Co. Commodity Services, 430 F.2d 132 (8th Cir. 1970); Arnold v. Bache & Co., 377 F.Supp. 61 (M.D.Pa.1973); McCurnin v. Kohlmeyer & Co., Inc., 347 F.Supp. 573 (E.D.La.1972). Interpreting § 6b, Judge Rubin in McCurnin said:
 
 
 16
 That section is clearly directed only toward wilful misconduct.
 
 
 17
 The C.E.A. does not use sweeping terms. Its pejoratives are simple and pointed: it uses the words "cheat" and "defraud" and "wilfully." By any definition these connote deliberate acts or a degree of negligence that is so gross as to approach wilfulness. This interpretation is strengthened by the fact that criminal penalties are attached to a violation of Section 6b, 7 U.S.C. § 13. . . .
 
 
 18
 347 F.Supp. 573, 575-576.
 
 
 19
 The quoted reasoning is supported by a recent Supreme Court decision holding that broad language in Section 10(b) of the Securities Exchange Act of 1934 prohibiting "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe," requires a finding of willful or fraudulent action and not mere negligence. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). We hold that if a right of action is to be implied under 7 U.S.C. § 6b, willful or fraudulent action is required for recovery.
 
 
 20
 The only contention of willful or fraudulent conduct on the part of Master Commodities or RB&H is that they knew of reporting requirements under Rule 942 of the Chicago Mercantile Exchange and under Commodity Exchange Act regulations and ignored them. It is alleged, as the trial judge found, that the CRP-74 account was "controlled" by TCM under 17 C.F.R. § 1.3(j), thereby invoking the § 1.33a requirement that the broker "promptly confirm in writing directly to the customer for whom such account is carried the execution of any trade originated by the controller of the account . . ." Section 1.37 requires the brokers to keep a record of "the true name and address of the person for whom such account is carried . . ." Rule 942 of the Chicago Mercantile Exchange requires the broker take several steps to assure the true owner of a controlled account is apprised of the trades name.
 
 
 21
 Master Commodities and RB&H give several reasons for failure to notify CRP-74 at its New York address of trades in the futures account. These include that they did not know the principal's address (a security agreement with an Ohio bank containing that address was in possession of Master Commodities, but not sent to RB&H); the address on the account was that of the agent in Amarillo, Texas to which confirmations were sent; CRP-74 partners knew confirmations were going to the agent's address and took no steps to bring contrary desires to the brokers' attention; the brokers had no knowledge any trades were beyond the agent's authority. Most importantly, the brokers claim reliance upon an opinion of counsel for the Chicago Mercantile Exchange that hedging accounts such as this are not considered controlled or managed accounts subject to Rule 942.
 
 
 22
 There is no evidence in the record of behavior on the part of either Master Commodities or RB&H arising to the level of willful or fraudulent conduct envisioned by the cases to support recovery under the Commodities Exchange Act or the regulations thereunder. Pertinent to Rule 942 of the Chicago Mercantile Exchange, this circuit has held that in an appropriate case we might imply a cause of action for private redress for violation of an exchange rule. Utah State University v. Bear, Stearns & Co., 549 F.2d 164 (10th Cir. 1977). But there we held that "something more than mistake or negligence must be shown," and affirmed a dismissal where the allegations were not tantamount to fraud. 549 F.2d at 168.
 
 
 23
 We conclude that so far as the trial court's judgment was based upon a direct cause of action for private redress implied under the Commodities Exchange Act, its regulations or Rule 942 of the Chicago Mercantile Exchange it is not sufficiently supported by the evidence. We do hold, however, that the duties imposed upon brokers under these rules may be considered in defining the responsibilities of the brokers in assessing liability under agency law principles, as is more fully discussed below.
 
 II
 
 24
 We next consider whether the decision of the trial judge may be supported by application of general agency law principles. The trial judge found that Master Commodities acted as agent for RB&H in the various brokerage transactions, and all knowledge of its officers and employees is imputed to RB& H. We agree that there is substantial evidence in the record to support this finding. RB&H provided brokerage forms, handled all trade clearances through the exchange, maintained the records, billed for margin calls, and mailed out trade confirmations. Money was frequently collected through Master Commodities which deposited it directly into RB&H's account, on which Master Commodities was not authorized to draw checks. Master Commodities had most of the client contacts, but received its compensation in the form of commissions paid monthly by RB&H.
 
 
 25
 The trial judge found specifically that Master Commodities knew at the time the brokerage account was opened that TCM was acting as CRP-74's agent; that no representative of the brokers inquired into the scope of TCM's authority to act, nor made any effort to obtain the written power of attorney or management contact or to contact CRP-74 with respect to the TCM agency or the scope of its authority. He found that TCM was a "limited" agent with circumscribed powers; that all cattle futures transactions after February 5, 1975 were outside the agent's authority.
 
 
 26
 The record shows that CRP-74 is a general partnership set up by a New York attorney Joel Burton Ahrens (Ahrens) for certain of his clients. His law firm is a partner, and Ahrens acted as the spokesman for the partnership in most of its dealings. Ahrens had hired Hughens to investigate some problems for a 1972 partnership involving most of the same people. He used a firm with which Hughens was then associated to supervise a cattle feeding partnership in 1973 hereafter called NALCO-73, and then hired TCM, a company established by Hughens and which he served as president, to oversee the cattle feeding program for the 1974 partnership, CRP-74.
 
 
 27
 There was a written management agreement with CRP-74 which gave TCM broad supervisory authority to select feedlots, negotiate and execute feeding contracts "and oversee the buying, management, and selling of all the Client's cattle being fed subject to this Agreement as hereinafter more fully set forth . . . " (§ I.2) Limitations were placed in certain respects, such as that the feeder selected must be one which would guarantee the cost of gain for the cattle.
 
 
 28
 As to commodities futures trading, the agreement stated:
 
 
 29
 I.3 TCM shall only purchase Feeder cattle at such time as the futures market in fat cattle at approximately the month that the newly purchased cattle will be ready for market is in parity with the break-even price (i. e., purchase price of the Feeder cattle plus cost of gain) for the purchased cattle. If at any time during the cycle the futures price is at least 20% More than the break-even price, TCM shall sell such contract in a hedging transaction. The hedging transaction shall be arranged in a manner that any excess margin calls on an increase in price shall be secured solely by the cattle in the program and without recourse to the Client.
 
 
 30
 In September 1974 Hughens opened a commodities trading account for CRP-74 which was carried on the books of Master Commodities and RB&H under the name and address "Texas Cattle Management-Cattle Resources Partnership-1974, P.O. Drawer 7527, Amarillo, Texas 79109." The address used was that of TCM's office. In addition to the management agreement there was a power of attorney given by CRP-74 to TCM, and a feeding agreement with United Beef Producers, Inc. which mentioned futures trading. Neither Master Commodities nor RB&H ever asked for or received any of these documents; nor did they have any contact with Ahrens or any other partner. A security agreement representing the partnership's credit arrangement with the Southern Ohio Bank and containing CRP-74's New York address was given to Master Commodities.
 
 
 31
 In October 1974 TCM made its first futures trade for the partnership, a short sale of 10 contracts which admittedly was within the terms of the actual authority granted under the agreement, as was the purchase of 10 contracts in February 1975 to cover this short sale when the cattle were sold from the feedlot. Several transactions were made thereafter, commencing in March 1975, all of which were admitted by Hughens to exceed the actual authority granted TCM by the partnership. One of these trades, April 4, 1975 put the partnership in a "long" position, inconsistent on its face with a hedge position of a cattle feeder, who normally sells contracts short then covers or closes out by a purchase at the time he sells his fat cattle from the feedlot. The testimony of both Hughens and Ahrens was clearly to the effect that all transactions after February 1975 were outside the scope of the actual authority of TCM. This is also supported by the words of the contracts and other evidence.
 
 
 32
 Liability based upon apparent authority requires reliance by the third party dealing with the agent upon manifestations by the principal.
 
 
 33
 Apparent authority results from a manifestation by a person that another is his agent, the manifestation being made to a third person and not, as when authority is created, to the agent. . . . (A)pparent authority exists only with regard to those who believe and have reason to believe that there is authority; there can be no apparent authority created by an undisclosed principal.
 
 
 34
 Restatement (Second) of Agency § 8, Comment a (1958). Since there was no personal contact between the commodities brokers and CRP-74 or any of its partners, and no review or reliance upon any of the documents evidencing the power of the agent, apparent authority cannot derive from these sources.
 
 
 35
 In connection with NALCO-73 Ahrens had signed an RB&H account card and other documents permitting North American Land Company, with which Hughens was then associated, to open a trading account. But that was a different partnership, involving mostly different partners, and the agent was not the same although it was a company identified with Hughens. Further the only knowledge of the partners in CRP-74 or of any connection between the two partnerships on the part of the brokers prior to April 1975, had to be by inference from the fact that Ahrens' name appeared on the Ohio bank security agreement given to an employee of Master Commodities. Essentially the only actions by the principal which could be said to have been relied upon by the third party brokers are that the principals permitted the trading account to be opened, allowed the agent to write checks for margin calls, and the checks were honored until June 1975. This can only be categorized as apparent authority by arguing that since the principal permitted the agent to act in connection with futures trades over a period of time, it should be held to be bound by the agent's transactions as that of a general agent acting within the usual scope of a futures trader's authority.
 
 
 36
 The brokers rely upon the statement of the Oklahoma court in R. V. Smith Supply Co. v. Stephens, 169 Okl. 555, 37 P.2d 926, 929 (1934):
 
 
 37
 On this point we hold that one dealing with a known agent has a right to presume that the agency is general and not special and that the agent is acting within the scope of his authority and the principal will be bound by the act of the agent.
 
 
 38
 This statement has been quoted in later cases, E. g., Palovik v. Absher, 198 Okl. 671, 181 P.2d 989, 994 (1947), and appears to have originated in slightly different form in Midland Sav. & Loan Co. v. Sutton, 30 Okl. 448, 120 P. 1007, 1011 (1911):
 
 
 39
 Parties dealing with a known agent have a right to presume that the agency is general, and not special, and the presumption is that one known to be an agent is acting within the scope of his authority. . . .
 
 
 40
 The statements are indeed broad, and if taken literally would confer extraordinary apparent authority upon all agents. There is, however, an apparently conflicting quotation which appears with equal consistency in the cases, which originated in McDonald v. Strawn, 78 Okl. 271, 190 P. 558, 561 (1920):
 
 
 41
 It is incumbent upon a person dealing with an alleged agent to discover at his peril whether the assumed agency be general or special, that such pretended agent had authority, and that such authority is in its nature and extent sufficient to permit him to do the proposed act. . . .
 
 
 42
 See American Body & Trailer Co. v. Higgins, 195 Okl. 349, 156 P.2d 1005, 1009 (1944); McCall v. Monarch Royalty Corp., 179 Okl. 213, 64 P.2d 871, 873 (1937); Shuler v. Viger, 123 Okl. 110, 252 P. 18, 20 (1926).
 
 
 43
 Reading these and other cases, it seems clear that Oklahoma, as other states, looks at the use of the agent in the context of the particular case, and holds that there is apparent authority for acts which might reasonably be expected to be performed by such an agent. See American Nat'l Bank of Sapulpa v. Bartlett, 40 F.2d 21 (10th Cir. 1930); Rosser-Moon Furniture Co. v. Oklahoma State Bank, 192 Okl. 169, 135 P.2d 336 (1943); A. J. McMahan & Co. v. Hibbard, 182 Okl. 503, 78 P.2d 409 (1938); Walker Valley Oil & Gas Co. v. Parks & Palmer, 128 Okl. 286, 262 P. 672 (1928).
 
 
 44
 Arguably here there was no reliance upon the agent's power to bind the principal at all, even though Master Commodities knew TCM was acting as agent and the account was opened as one for a partnership. When the NALCO-73 partnership account went to a deficit position RB&H did not attempt to sue the principal, but only Hughens individually. And when it obtained a personal judgment against him, with a writ of attachment it tied up a separate trading account of the Larson Cattle Company, which its pleading declared Hughens served as agent and commodities trader. This tends to show no reliance upon the fact Hughens was serving as an agent, ignorance of the law of agency or disregard of it.
 
 
 45
 Appellants' arguments that CRP-74 is bound by Hughens' acts because of estoppel, waiver and ratification seem essentially based upon what the Restatement (Second) of Agency § 8A (1958) has called "inherent agency power." In an agency context, estoppel is a variety of apparent authority and requires reliance by the third party upon appearances created by or known to the principal as to the agent's authority. See Walker Valley Oil & Gas Co. v. Parks & Palmer, 128 Okl. 286, 262 P. 672 (1928); Nat'l Sur. Co. v. Miozrany, 53 Okl. 322, 156 P. 651 (1916). "Full knowledge of the unauthorized act, and of all material matters related to it, is an essential of a valid ratification." American Nat'l Bank of Sapulpa v. Bartlett, 40 F.2d 21, 23 (10th Cir. 1930); Shuler v. Viger, 123 Okl. 110, 252 P. 18 (1927).
 
 
 46
 What appellants seek is a determination that this falls into the category of cases where society's interests are better served by imposing liability upon the principal, because of the agency relationship which exists in the particular case, than to impose the loss upon the third parties who dealt with the agent.
 
 
 47
 On this theory, tilting in favor of the third party brokers is the fact CRP-74 permitted the agent to establish a futures trading account, provided the funds, including a banking arrangement which honored all checks until July 13, 1975. Also Ahrens had knowledge that confirmations and statements were going to the agent's address and never complained to the brokers. In favor of the principal CRP-74, the brokers, though they knew TCM was acting as agent, did not ask for nor receive any account cards, hedge account information, or indicia of authority of the agent to act.
 
 
 48
 For the brokers it is argued that the principal gave TCM written authority which, if examined, would not have told the brokers whether or not a particular trade was authorized, and which contained a statement that no third party need inquire of the principal as to the authority of the agent to take any particular action. For CRP-74 it is pointed out that the brokers never looked at any such document, nor made any attempt to do so.
 
 
 49
 In favor of the brokers is that TCM had continuing responsibilities to serve the principal over a period of time and broad authority over cattle feeding operations, all of which points to a general agency relationship. In favor of the principal, the written agreement was limited as to time, the agent's authority was expressly restricted in several aspects, and even if TCM might be a general agent in supervising feeding operations that should not necessarily make it a general agent for dealing in commodities futures. When the trading account went "long" April 4, 1975 at least then a commodities broker should know something was being done which was unusual for a cattle feeder.
 
 
 50
 The brokers make much of the fact partners in CRP-74 found out that Hughens had exceeded his authority in futures trading for another partnership account, NALCO-73, in which Ahrens and his law firm were involved, and made no effort to communicate that to the brokers. It may be noted, however, that the breach should have been known to RB&H, which had to sue when the NALCO-73 account went deficit, and chose to sue Hughens personally.
 
 
 51
 It might be argued that it is essential to the operation of the commodities futures business that brokers should not have to check the authority of an agent to make each trade. On the other hand if the broker has no duty to inquire there is no practical limit to the liability which an agent may inflict upon his principal by unauthorized trades, which would itself prevent futures trading by businesses with a real need to be in the commodities market.
 
 
 52
 Obviously in retrospect both parties can be faulted for their actions or lack of them in the instant case. It is the responsibility of the law, however, to decide which must bear the loss. That depends upon which had the duty to inform or inquire. Did CRP-74 have a duty to seek out the broker and inform it of the limitations upon the agent's authority, or did the brokers have to ascertain the authority of the agent? From the record it seems to us that the reliance of the trial judge upon Rule 942 of the Chicago Mercantile Exchange and the controlled account regulations under the Commodities Exchange Act, was in answering this question. By those rules the burden is placed upon the brokers to ascertain the identity and addresses of principals where the trades are to be made through agents. The intended protection is that if the principal is informed of each trade, one who is unhappy with the actions of his agent can terminate the agency before additional harm occurs. Thus the Commodities Exchange Act and the exchange have established a norm that in managed accounts the principal is bound by unauthorized trades (unless the agent's apparent authority requires a contrary result) until he notifies the broker of limitations upon or termination of the agent's authority. This presupposes, of course, that the principal is informed of the trades. The trial judge here held that Rule 942 was intended to apply to hedge accounts, and we agree. Neither Rule 942 nor the controlled account regulations distinguish between speculative and hedging accounts. The philosophy behind the rules seems equally applicable to both types of account, as the instant case graphically demonstrates.
 
 
 53
 The trial judge found that the trades through February 5, 1975 were within the scope of the agent's actual authority, and the principal should be bound by and have the benefit of such trades. The trade on March 21, selling 25 April contracts, was not authorized, but the judge bound the principal, because had the broker followed Rule 942 the principal would not have known about the transaction until after it was made. He would be bound until notified of the first unauthorized trade. We agree with that conclusion, as an equitable solution.
 
 
 54
 The court found that the liability of the principal here, however, was only to the extent of the $13,000 margin payment on that date. In that respect we disagree. Had he been informed he could have done nothing more than buy to cover the short sale of March 21 to close it out. In fact the next purchase was April 4, when 45 April contracts were bought, more than covering the March 21 short sale. Perhaps had the principal been informed under Rule 942 it could have acted sooner and reduced its losses. But we think it is reasonable under the circumstances to treat 25 of these contracts as closing out the March 21 short sale, and to hold the principal for the entire loss which would result by such treatment but not for any later transactions. Appellant claims this means RB&H should be credited with an additional $14,240 ($27,240 total loss less $13,000 credited under the court's judgment). We do not perceive that appellee disagrees with that calculation, if we hold as we have above. Should there be disagreement upon the mathematics of the calculation it shall be resolved by the trial court on remand.
 
 III
 
 55
 RB&H challenges the trial court's judgment against it for conversion of $13,000 received by RB&H from the CRP-74 account to pay off Hughens' personal debt. As noted this arose out of Hughens trading for the NALCO-73 partnership, as a result of which RB&H sued Hughens personally and obtained judgment. The check used for payment was drawn by Hughens upon the CRP-74 partnership account, made payable to RB&H and given to Master Commodities which deposited it into the RB&H account.
 
 
 56
 The action by Hughens clearly exceeded his authority, as he admitted. He concealed the payment from his principal, CRP-74. Oklahoma law is clear that when a debtor pays his personal debt with a check drawn payable to his creditor on his employer's bank account, the creditor is thereby placed on notice to inquire as to the employee's authority. Great Southwest Life Ins. Co. v. Pruitt & Harp, 177 Okl. 544, 61 P.2d 683 (1936). Certainly the facts show Master Commodities and RB&H knew Hughens was having difficulty paying the $13,000. He had asked for an extension of time and had tendered his personal note, which had been rejected. RB&H had filed a writ of attachment upon the Larson Cattle Company account to put pressure upon Hughens. This is not an appropriate case for finding CRP-74 liable upon either apparent authority or inherent agency power principles.
 
 
 57
 The only basis for holding in favor of RB&H on this issue would be if the $13,000 was money to which Hughens was entitled, the debt paid was that of CRP-74, or there was ratification. Hughens was not entitled to the money. Even if this was NALCO-73's debt, it was not the debt of CRP-74, a different partnership with mostly different partners. And, as stated above, there can be no ratification without full knowledge of the unauthorized act and of all material matters related to it. American Nat'l Bank of Sapulpa v. Bartlett, 40 F.2d 21 (10th Cir. 1930); Shuler v. Viger, 123 Okl. 110, 252 P. 18.
 
 
 58
 The trial court's judgment on this issue is affirmed.
 
 IV
 
 59
 The final issue concerns the award of $15,000 attorney's fees to CRP-74, pursuant to what the judge considered a stipulation between the parties. Appellants complain that they stipulated to the method of establishing the amount of the attorney's fees, but not that this is a proper case in which the award can be made. On appeal they assert this is not an appropriate case for the award of attorney's fees.
 
 
 60
 We do not agree. We construe the stipulation of counsel to cover both the propriety of the award and the method of establishing its amount. The record on this matter is as follows:
 
 
 61
 THE COURT: I think this is all of your evidence, isn't it?
 
 
 62
 MR. DEAN: Your Honor, if I might have the exhibit to look at the documents; we are substantially through. We have pled in this instance, Your Honor, for attorney's fees. Mr. Woods and I have discussed it. The case has gone much too long; if we don't win, the evidence is not relevant to anything. Would it be acceptable to this Court for us at the appropriate time to rest, subject at a later date to put on evidence as to attorney's fees, in the event the Court needs that evidence?
 
 
 63
 THE COURT: Well, perhaps we can have the stipulation on that item, either side that wins is going to get a reasonable attorney fee. Under the law, if the plaintiff wins, they get a reasonable attorney fee. Many times counsel will stipulate the Court can fix that without hearing evidence, based upon its knowledge of what has been done and a reasonable
 
 
 64
 MR. DEAN: I simply did not want to fail to put on proof, nor did I want to unnecessarily put on evidence.
 
 
 65
 THE COURT: Could we have such a stipulation?
 
 
 66
 MR. HENSLEY: Plaintiff will so stipulate.
 
 MR. DEAN: Let the Court, so
 
 67
 MR. WEIL: We stipulate.
 
 
 68
 THE COURT: Fix it based upon my knowledge of what has been done; I have got some idea of how many depositions you have taken, where you have gone, and I know the complexity of the case from listening to it.
 
 
 69
 MR. DEAN: I would be more than happy to so stipulate.
 
 THE COURT: I believe all parties then agree
 
 70
 MR. WEIL: (Nodding yes).
 
 
 71
 THE COURT: that the Court may fix attorneys' fees for whoever might be the prevailing party, then, without hearing any proof thereon, but based upon the Court's knowledge of what has been done in the case.
 
 
 72
 Now, go ahead with your rebuttal evidence. . . .
 
 
 73
 Even if the stipulation is considered to leave open the issue of the appropriateness of such fees, we think this is a suit on an open account debt or statement of accounts within the meaning of Okl.Stat. tit. 12, § 936. See Bache & Co. v. Clay, 366 F.Supp. 1248 (W.D.Okl.1973); Nicholson v. Thixton, 448 P.2d 454 (Okl.1968). We affirm the trial court's award in favor of CRP-74.
 
 
 74
 Of course, Master Commodities prevailed against TCM in the instant case when that defendant defaulted. As Master Commodities contends in this appeal, the judge should have established and awarded attorney's fees against TCM.
 
 V
 
 75
 The trial court's judgment is affirmed in all respects except with respect to the calculation of damages discussed above in Part II, and upon remand the trial court is directed to establish a reasonable attorney's fee in favor of Master Commodities, Inc. against the defaulting defendant Texas Cattle Management Company.