**Russell C. TAYLOR, Plaintiff,**

v.

**BEAR STEARNS & COMPANY, et al., Defendants.**

**Civ. A. No. C82–2059A.**

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 30, 1983.

J. Boyd Page, Cofer, Beauchamp, Hawes & Brown, Atlanta, Ga., for plaintiff.

Robert Thornton, King & Spalding, Gary W. Hatch, Hansell Post, Brandon & Dorsey, Richard Kirby, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

This action, brought under the Securities Exchange Act of 1934 (SEA), the Commodity Exchange Act (CEA), the Racketeer Influenced and Corrupt Organizations Act (RICO), and which has several state theories, is before the court on defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) and 12(b)(6). This court has jurisdiction over this action pursuant to Section 27 of the SEA, 15 U.S.C. § 78aa; Sections 1331 and 1332 of the Judicial Code, 28 U.S.C. §§ 1331, 1332; and pursuant to the doctrines of pendent and ancillary jurisdiction.

Plaintiff alleges that while defendant Bowman was employed by Paine, Webber, Jackson & Curtis, Inc. (Paine Webber), plaintiff opened several accounts for which Mr. Ishmael Bowman (Bowman) acted as broker. Plaintiff alleges that these accounts were opened approximately from July 12, 1978, to August 10, 1979. Plaintiff alleges that in approximately August of 1979, defendant Bowman changed employers and began working for Bear Stearns & Co. (Bear Stearns). On or about August 10, 1979, plaintiff alleges that he opened his account with Bear Stearns, with defendant Bowman acting as broker. Plaintiff allegedly closed his Paine Webber account on or about August 10, 1979, and thereafter had no further dealings with Paine Webber. Plaintiff closed his accounts at Bear Stearns on or about October 15, 1980, and thereafter had no further dealings with Bear Stearns. In general terms, plaintiff alleges that he lost money in his accounts both at Paine Webber and Bear Stearns as a result of a series of unauthorized trades undertaken by the defendants for the purpose of generating commissions.

In their motions to dismiss, defendants seek to dismiss plaintiff's claims under Section 10(b) of the SEA, Section 10 of the Fair Business Practices Act of 1975, Sections 4b and 4c of the CEA, and RICO. In addition, defendant Giarletta moves pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss all counts and claims as against him individually on the ground that he is not subject to the personal jurisdiction of this court.

For the reasons set forth below, defendants' motions shall be GRANTED IN PART and DENIED IN PART.

## I.

■ A. The central task in determining whether Counts I and II are to be dismissed is to find a "security" that was the object of the activities in question. *Woodward v. Metro Bank,* 522 F.2d 84, 91 (5th Cir.1975). Section 10(b) of the Securities Exchange Act of 1934, which provides the basis for Counts I and II, provides, in pertinent part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 of the Securities and Exchange Commission provides, in pertinent part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, . . .

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

In the case at bar, plaintiff maintained discretionary securities and commodities futures investment accounts with defendants Paine Webber and Bear Stearns. In addition, plaintiff invested in a commodities futures trading program directed by defendant Bowman while he was employed at both Paine Webber and Bear Stearns. Amended Complaint, ¶¶ 19, 20. In his brief, plaintiff asserts that the transactions at issue involved Treasury Bills, Treasury Bonds, GNMAs, and commercial paper, and contends therefore that this action involves "securities" within the meaning of Section 3(a)(10), 15 U.S.C. § 78c(a)(10). Defendants contend, on the other hand, that plaintiff's claims under Section 10(b) and Rule 10b–5 must be dismissed because the commodities futures accounts upon which plaintiff bases his claims do not constitute securities and that accordingly the securities claims are inapplicable to this action.[1]

The issue presented on this motion to dismiss for failure to state a claim under the federal securities law is whether the allegations in the complaint permit a finding that a defendant sold to this plaintiff "securities" within the meaning of the Securities Exchange Acts of 1934. For the plaintiff to prevail on federal securities claims, it must be determined that what were fraudulently sold to plaintiff by defendants were "securities." Plaintiff avers

---

1. To the extent that defendants argue that since "securities" are not involved in this case and since the CEA governs the conduct of parties in commodities markets, the CEA precludes the application of the SEA through preemption, the analysis in II.A. of this order regarding preemption also applies.

that he communicated with Paine Webber, Hudson, and Bowman regarding an interest rate futures trading program, Amended Complaint, ¶ 25, which entailed an "unusual type of trading called spread trading," id., ¶ 27, and that as a result of the communications, he entered into a contract with Paine Webber and opened a discretionary securities and commodities account. Id., ¶ 29. While it is not clear whether plaintiff is alleging fraud in the sale of any particular investment instrument, it is clear that plaintiff is alleging fraud in the sale of a program by his opening of a discretionary account. Id., ¶ 33. See also ¶ 43A. Similarly, as to defendant Bear Stearns, it appears that the alleged fraud occurred in the sale of "the overall accounts and trading program." Id., ¶ 56. See also, id., ¶ 60.

▆ The term "security" includes "any ... investment contract." 15 U.S.C. §§ 77b(1); 78c(a)(10). In determining whether a particular financial relationship constitutes an investment contract, this court must evaluate whether (1) the scheme involves an investment of money (2) in a common enterprise (3) with profits to come solely from the efforts of others. SEC v. W.J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). See Moody v. Bache & Co., Inc., 570 F.2d 523, 526 (5th Cir.1978) (discretionary accounts in commodities futures contracts may be investment contracts for purposes of the Securities Act).

A review of the complaint read in light of the Howey test reveals that plaintiff "invested" in accounts at Paine Webber and Bear Stearns. Plaintiff avers that he parted with money in the hope of receiving profits through the efforts of another individual with expertise in the management of his money. The complaint can be read to allege that plaintiff's placement of money into the discretionary securities and commodities futures investment accounts and in a commodities futures trading program subjected him to a risk over which he had no control. The complaint can further be read to allege that since plaintiff was not knowledgeable about investments, plaintiff had expectations that defendants would make all decisions prudently as to the management of the accounts.

As to the second consideration of the Howey test, the averments suggest a "common enterprise." A common enterprise is said to exist where "the fortunes of the investor [were] interwoven with and dependent upon the efforts and success of those seeking the investment ...." SEC v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 482 n. 7 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). Defendants at all relevant times were engaged in the securities and commodities futures contracts brokerage and financial services business and rendered services to clients including the investigation of investment alternatives and opportunities, the managing of securities and commodities futures contract accounts for clients, and the directing of securities and commodities futures contract transactions and trading programs for clients. See Amended Complaint, ¶ 14. As such, an investor could inexorably rely upon their guidance for the success of his or her investment. Here, allegations of defendants' dominance of the financial relationship exists. Such a dominance provides commonality. See SEC v. Continental Commodities Corp., 497 F.2d at 522–23 (5th Cir.1974). Given plaintiff's expectation that defendants were his investment managers, there exists a one-to-one relationship or a "vertical commonality." Surino v. E.F. Hutton & Co., Inc., 507 F.Supp. 1225, 1237 (S.D.N.Y.1981); Alvord v. Shearson Hayden Stone, Inc., 485 F.Supp. 848, 853 (D.Conn.1980).

As to the final consideration of the Howey test, the averments suggest that plaintiff invested in an enterprise according to which the hoped-for profits were to come solely from the efforts of others. Plaintiff avers that all investment decisions were to be made by defendants; as such, any profits were to be caused by defendants' efforts.

Therefore, under the Howey test, plaintiff may have purchased "securities" when he opened his discretionary accounts to be managed by defendants. Thus, defendants'

argument that Rule 10b–5 has no application in this action because the instruments upon which plaintiff bases his claims were commodities futures contracts over which the SEC has no regulatory jurisdiction is without merit.

■ B. Defendants further argue that plaintiff's claims pursuant to Section 10(b) and Rule 10b–5 are barred by the applicable statute of limitations. This argument must be rejected on the ground that it is premature to evaluate this issue at this Rule 12 posture.

Plaintiff alleges that his accounts with Paine Webber were opened on July 12, 1978, and closed on August 10, 1979. Amended Complaint, ¶ 19. Plaintiff also alleges that his account with Bear Stearns was opened on August 1, 1979, and closed on October 15, 1980. Plaintiff's original complaint in this action was filed on September 17, 1982.

In *Diamond v. Lamotte,* 709 F.2d 1419 (11th Cir.1983), the Eleventh Circuit recently affirmed this court and held that the two-year statute of limitations prescribed by the Georgia blue sky statute governs an action brought pursuant to Section 10(b) and Rule 10b–5 in a federal court sitting in Georgia. Yet, the question as to when plaintiff was put on notice as to the facts constituting its alleged cause of action cannot be properly determined at a motion to dismiss stage. As the court in *Azalle Meats, Inc. v. Muscat,* 386 F.2d 5, 9 (5th Cir.1967), stated, in reversing the district court for determining at a Rule 56 stage the point at which the plaintiff was put on notice:

> The concept of due diligence is not imprisoned within the frame of a rigid standard; it is protean in application. A fraud which is flagrant and widely publicized may require the defrauded party to make immediate inquiry. On the other hand, one artfully concealed or convincingly practiced upon its victim may justify much greater inactivity. The presence of a fiduciary relationship or evidence of fraudulent concealment bears heavily on the issue of due diligence.

(Footnote omitted). This principle was recently reaffirmed in *Kennedy v. Tallant,* 710 F.2d 711, 716 (11th Cir.1983). The complaint alleges both the presence of a fiduciary relationship and fraudulent concealment.

Accordingly, defendants' motion to dismiss Counts I and II for failing to state a claim under Section 10(b) and Rule 10b–5 on the grounds that the claims are barred by the applicable statute of limitations or inapplicable on these facts is DENIED.

## II.

■ In Count V, plaintiff alleges a violation of the Georgia Fair Business Practices Act (FBPA), O.C.G.A. §§ 10–1–393; 10–1–399. Specifically, plaintiff alleges that defendants participated in, approved, consented to, aided and abetted, and conspired together and with others in: (a) employing unfair or deceptive trade practices, business practices, and business acts in connection with soliciting, managing and directing plaintiff's securities, commodities futures and investment accounts and trading programs, (b) representing that services had sponsorship, approval, characteristics, ingredients, uses, benefits that they did not have, (c) representing that defendant Bowman had approval, status, affiliation or connections that he did not have, and (d) representing that securities brokerage and commodities futures trading services were of a competent and superior standard, quality or grade. Amended Complaint, ¶ 95. The Act provides that "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful." O.C.G.A. § 10–1–393(a). It allows a private action for any person who suffers injury or damages as a result of consumer acts or practices in violation of the Act to seek equitable injunctive relief and to recover general and exemplary damages. *Id.,* § 10–1–399(a). Given that the statute provides for a private right of action, a consumer who is damaged by unfair or deceptive practices in the conduct of any trade has an independent right to recover under

the Act regardless of any other theory of recovery. *Zeeman v. Black,* 156 Ga.App. 82, 273 S.E.2d 910 (1980); *Attaway v. Tom's Auto Sales,* 144 Ga.App. 813, 815, 242 S.E.2d 740 (1978). In addition, the providing for a private right of action is but "part of the enforcement and regulatory scheme underlying the public protection policy of the FBPA and does not create an additional remedy for redress of private wrongs occurring outside the context of the public consumer marketplace." *Zeeman,* 156 Ga.App. at 83, 273 S.E.2d 910.

> Also that [O.C.G.A. § 10–1–399] provides for equitable injunctive relief and for recovery of treble damages for intentional violations is further evidence that the legislature intended that section to serve as an aid in enforcing the underlying public protection policy of the statute by enlisting the litigative assistance of those individual members of the consuming public damaged by unfair or deceptive acts or practices and not as the basis for a new private remedy for individuals who are damaged by acts or practices which have no potential for impact on the general consuming public. In this remedial aspect the private remedy afforded by the FBPA is analogous to the federal anti-trust law, 15 U.S.C. § 15, which authorizes similar suits by individuals designed to further the broad public interest transcending the private objectives of the parties.

*Id.,* at 84, 273 S.E.2d 910. Defendants, in support of their argument that plaintiff's claims in Count V under the FBPA must be dismissed, provide three grounds: (i) Plaintiff's claims pursuant to the FBPA are preempted by the Commodity Exchange Act; (ii) by its own terms, the Act does not apply to the claims alleged in this action; and (iii) plaintiff's claims under the FBPA are barred by the statute of limitations. While the court concludes that the first ground is without merit at this Rule 12 stage, the court agrees with defendants that the Act, by its own terms, does not apply to the claims alleged in this action, and therefore grants defendants' motion to dismiss the FBPA claims.

A. The doctrine of preemption is derived from the supremacy clause of Article VI of the United States Constitution. The legislation which the defendants claim as the basis for preemption of the FBPA, a state statute, is the Commodity Exchange Act. Under the CEA, Congress exercised its power under the commerce clause to regulate commodity trading. In 1974, Congress amended the CEA and created the Commodities Futures Trading Commission (CFTC). Pursuant to Section 14 of the 1974 Amendments, the Commission is authorized to grant reparations to any person complaining of any violation of the CEA. 7 U.S.C. § 18. Section 2(a) of the 1974 Amendments provides that: "The Commission shall have exclusive jurisdiction with respect to accounts, agreements ... and transactions involving contracts of sale of a commodity for future delivery ...." 7 U.S.C. § 2. The Amendments also, however, contain a savings clause: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.* Thus, as to the language of the statute, tension appears to exist between the grant of "exclusive jurisdiction" to the CFTC and the savings clause stating that state and federal court jurisdiction is not limited or superseded. It appears, however, that the primary concern of Congress was preemption of federal and state regulatory schemes. *See generally* Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy,* 29 Vand.L.Rev. 1, 32–36 (1976).

> The purpose of the exclusive jurisdiction provision in the bill passed by the House was to separate the functions of the Commission from those of the Securities Exchange Commission and other regulatory agencies. But the provision raised concerns that the jurisdiction of state and federal courts might be affected. Referring to the treble damages action provided in another bill that he and Senator McGovern had introduced, Senator Clark pointed out that "the House bill not only does not authorize them, but section 201 of that bill may prohibit all court actions.

The staff of the House Agriculture Committee has said that this was done inadvertently and they hope it can be corrected in the Senate." It was. The Senate added a savings clause to the exclusive jurisdiction provision, providing that "nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or of any State." The Conference accepted the Senate amendment.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 1843, 72 L.Ed.2d 182 (1982) (footnotes omitted) (the Supreme Court held that a private right of action can be maintained for damages caused by a violation of the CEA).

Given this backdrop, federal courts have held that the CEA preempts private actions based on state statutes that entail administrative agency involvement which might conflict with the CFTC's regulatory role. *E.g., W & W Farms, Inc. v. Chartered Systems Corporation,* 542 F.Supp. 56, 59–60 (N.D.Ind.1982); *Witzel v. Chartered Systems Corporation,* 490 F.Supp. 343 (D.Minn. 1980) (claim under Minnesota Securities Act is preempted as that state's securities scheme contemplates state agency involvement and regulation). In other words, if there is a nexus between a private action and a state regulation which conceivably could conflict with the role of the Commission, preemption would be proper. *See Bache Halsey, Stuart, Inc. v. Hunsucker,* 38 N.C.App. 414, 248 S.E.2d 567 (1978) (where the utilization of a private action under the North Carolina Unfair Trade Practices statute could encompass a cause of action in the Attorney General, whereby the Attorney General could seek a court order to restore money or property, or cancel any contracts obtained in violation of the statute). Here, however, plaintiff does not rely on any section of the Georgia Fair Business Practices Act which would be inconsistent with the operation of the CEA regulatory procedures. *See generally* Rothschild, *A Guide to Georgia's Fair Business Practices Act of 1975,* 10 Ga.L.Rev. 917, 922–29 (1976). *Cf. Strax v. Commodity Exchange, Inc.,* 524 F.Supp. 936, 941–42 (S.D.N.Y.1981) (opera-

tion of the New York State antitrust law would not interfere with the implementation of the CEA). Therefore, at this Rule 12 stage, plaintiff's claims under the FBPA could not be dismissed on this ground, inasmuch as the allegations of the complaint with respect to the FBPA do not entail an inconsistency with the regulatory scheme of the CFTCA. *Cf. Strobl v. New York Mercantile Exchange,* 561 F.Supp. 379, 385 (S.D. N.Y.1983) (if, upon development of the facts, a claim would conflict with the regulatory scheme of the Commission, recovery would be barred).

■ B. Unfair or deceptive consumer acts or practices violate the FBPA, unless such activity falls within one of two exemptions created by section 6. The first exemption excludes from the Act's coverage conduct which is "specifically authorized" by state or federal laws. O.C.G.A. § 10–1–396(a). The second exemption protects the news media from the consequences of violations found in advertisements which are printed for others. *Id.* § 10–1–396(b).

Under the first exemption, two interpretations are possible. The first interpretation would exempt from the Act conduct that was specifically authorized. The second interpretation would exempt conduct that is being regulated by an administrative agency. While in the abstract it is possible to envision a regulatory agency's permitting of "activities which do not conflict with the interests which that agency is charged to protect, with no pretense of concern whether those activities might harm other interests," *Rothschild, supra,* 10 Ga.L.Rev. at 921, practically speaking, the court perceives that an interpretation of section 6 that would exempt conduct authorized specifically by an agency as anomalous, for what administrative agency would authorize an unfair trade practice? In light of the purpose of the FBPA as well as a judicial construction of section 6, the court reads the second interpretation as proper.

It is apparent that the scope of the Act is directed toward consumer injuries rather than private wrongs. *Zeeman,* 156 Ga.App.

at 83, 84, 273 S.E.2d 910. Inasmuch as the Act makes specific reference to the Federal Trade Commission Act, 15 U.S.C. § 45, the FBPA is to be invoked only in those instances where the unfair or deceptive practice would have a potential effect on the general consumer public. *See* O.C.G.A. § 10-1-391; *FTC v. Cinderella Career & Finishing Schools, Inc.,* 404 F.2d 1308, 1313 (D.C.Cir.1968). With the aim of the Act to protect the consumer, it appears that the concern of the Georgia Legislature in enacting the FBPA was to supplement and emendate the remedies in existence prior to 1975. *See generally* Comment, *Consumer Protection in Georgia: The Fair Business Practices Act of 1975,* 25 Emory L.J. 445–54 (1976).

Yet, to the extent that a remedy is available to an injured consumer in a regulated industry, a Georgia appellate court has held that the FBPA has no application. In *Ferguson v. United Insurance Co.,* 163 Ga.App. 282, 293 S.E.2d 736 (1982), a named beneficiary of an insurance policy was apparently seeking the proceeds due her on the life of her deceased husband. In affirming a trial court's dismissal of a count alleging violations of the FBPA, the court held that "insurance transactions are among those types of transactions which are exempt from the Fair Business Practices Act." *Id.* at 283, 293 S.E.2d 736. The court explicitly noted that "[i]nsurance transactions in Georgia are *specifically authorized and regulated* by Title 56, the Georgia Insurance Code," and that "the Insurance Code regulates unfair trade practices within the insurance industry." *Id.* (emphasis added). Thus, given *Ferguson,* the phrase "specifically authorized" in section 6 is construed to mean specifically regulated. Therefore, in a situation where a consumer remedy exists, with no need to fill in a legal gap or create a consumer right, and where the industry which is the subject matter of the situation explicitly defines wrongful conduct or unfair and deceptive practices, the FBPA has no application.

In the case at bar, the SEA and CEA have implied rights of action for injured persons. Both Acts provide a regulatory apparatus to prevent unfair practices that affect consumers. Therefore, adequate remedies for this plaintiff exist, and there is no need to fill in any gap created by the inadequacies of these remedies.

Accordingly, inasmuch as the alleged wrongful transactions which provide the basis for this lawsuit entail conduct that is "specifically authorized and regulated," *Ferguson,* 163 Ga.App. at 283, 293 S.E.2d 736, by the Securities and Commodity Exchange Acts, plaintiff's claims under Count V must be dismissed.

### III.

In Count VI, plaintiff alleges a violation of Section 4b of the CEA, 7 U.S.C. § 6b. In Count VII, plaintiff alleges a violation of Section 4c of the CEA, 7 U.S.C. § 6c. Defendants argue that these counts must be dismissed, inasmuch as they are subject to a two-year statute of limitations, and therefore the claims are time barred.

Defendants argue that since there are similarities between federal securities fraud and commodities fraud, the same applicable limitations period should apply. Assuming *arguendo* this were true, it would be two years. *Diamond v. Lamotte,* 709 F.2d 1419 (11th Cir.1983). The appropriate analysis, however, would be to apply the limitations period governing the most closely analogous state cause of action after an examination of the federal cause of action and federal policies involved. *Id.,* at 1421 (citing *United Parcel Service v. Mitchell,* 451 U.S. 56, 60–61, 101 S.Ct. 1559, 1562–63, 67 L.Ed.2d 732 (1981); *Occidental Life Insurance Co. v. EEOC,* 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977)). Thus, a two-stage analysis would take place. First, the analysis would begin with an inquiry into the nature and character of the federal claims. *Diamond,* 709 F.2d at 1421; *see Mitchell,* 451 U.S. at 60–61, 101 S.Ct. at 1562–63; *International Union of Auto Workers v. Hoosier Cardinal Corp.,* 383 U.S. 696, 705–07, 86 S.Ct. 1107, 1113–1114, 16 L.Ed.2d 192 (1966). Second, the analysis would then focus upon whether the state limitations

period is inconsistent with the policies expressed in the federal statutes. *Diamond,* 709 F.2d at 1421. In any event, the court need not at this time decide the statute of limitations governing timeliness of actions brought for these violations of the CEA. As stated earlier, irrespective of the statute of limitations period utilized, the statute of limitations does not begin to run until the fraud could reasonably have been discovered. *See Azalea Meats, Inc. v. Muscat,* 386 F.2d 5 (5th Cir.1967). Therefore, this issue cannot be resolved on a motion to dismiss.

## IV.

In Count VII, plaintiff alleges a violation of Section 4c of the CEA, 7 U.S.C. § 6c. Specifically, plaintiff alleges the following:

> Defendants, in connection with the sale of commodities futures contracts in contravention of Section 4c of the Commodity Exchange Act, by use of the means and instrumentalities of interstate commerce and the exchanges, participated in, aided and abetted and conspired among themselves (a) to unlawfully enter into or report transactions, commodity [sic] known to the trade as a "wash sale," "cross trade," or "accommodation trade," or a fictitious sale, and (b) to enter into and to report falsely transactions at prices which were not true and bona fide prices.

Amended Complaint, ¶ 106. Section 4c comprehends "wash sales" and false report provisions, and makes unlawful such actions by any person in any commodity which may be used for hedging, pricing, or delivery. 7 U.S.C. § 6c(a). These provisions are intended to prevent transactions that are reported as though they were at arm's length and represented genuine supply-demand, but are in fact collusive and artificial; such transactions mislead market watchers as to the true volume of trading and may be part of a price-altering manipulation. 1 A. Braumburg & L. Lowenfels, *Securities Fraud & Commodities Fraud* § 4.6, at 82.-301–02 (1982) (hereinafter cited as *Securities Fraud & Commodities Fraud*). De-

fendant argues that there is no implied right of action under Section 4c of the CEA. The court agrees.

In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), a five-member majority held that implied actions are available to plaintiffs alleging violations of the CEA. Although "[t]he central question presented by these cases is whether a private party may maintain an action for damages caused by a violation of the CEA," *id.* 102 S.Ct., at 1827, a close reading of the facts indicates that specific violations of the Act were at issue only. *See, id.,* at 1834 n. 42; *id.* at 1836 n. 49. Justice Stevens, writing for the majority, found that the controlling question was not whether Congress intended to create a new cause of action when it passed the Commodity Futures Trading Commission Act of 1974, but instead whether Congress intended to eliminate remedies already available under the CEA. *See, id.,* at 1839. As the Court stated: "The relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." *Id.* n. 61 (quoting *Brown v. GSA,* 425 U.S. 820, 828, 96 S.Ct. 1961, 1965, 48 L.Ed.2d 402 (1976)). Posing the question in this fashion made Congress' silence dispositive: "The fact that a comprehensive reexamination and significant amendment of the CEA left intact the statutory provisions under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy." *Id.* 102 S.Ct., at 1841 (footnote omitted). Turning to the 1974 Act's legislative history, Justice Stevens found additional evidence that the Act's punitive and remedial provisions were intended to supplement, rather than to replace, the remedy that the courts had already provided. *See, id.,* at 1842–44. Justice Powell, in dissent, challenged both steps of the majority reasoning. He first maintained that the lower court rulings relied upon by the majority had been incorrectly decided. Resting the decision on Congress' purported recognition of such faulty case law, he found, usurped Con-

gress' power to define substantive rights and thereby violated the separation of powers. With respect to legislative history, Justice Powell's sifting of the voluminous hearings and reports on the Act disclosed evidence that Congress had planned a remedial scheme that denied a role for private causes of action or, at best, was unaware that such remedies existed.

Given that the violations of the CEA which were at issue in *Curran* did not include Section 4c of the CEA, the court finds that that case is not controlling. The decision addressed the anti-fraud provisions of the Act. *Compare* 7 U.S.C. § 6b *with* 7 U.S.C. § 6c (while § 6b defines unlawfulness for an agent to act in such a way on or on behalf of another person, § 6c simply defines unlawfulness as to an agent without regard to any individual or entity for whom that person acts). As such, the source of plaintiff's right must be found, if at all, in the substantive provisions of the Act which he seeks to enforce, and not solely by reference to other provisions contained in the statute. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 577, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979). Therefore, this court is required to conduct an independent inquiry into the validity of an implied right of action under Section 4c.

The starting point for such an inquiry is found in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In that case, the Supreme Court outlined the various factors relevant to determining whether a private right of action is implicit in a statutory scheme:

First, is the plaintiff "one of the class for whose especial benefit the statute was enacted" ... that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one ...? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted). It is apparent from Supreme Court cases since *Cort v. Ash* that the first two factors are most significant, "with the other two *Cort* factors ignored except as breaks on the first two." L. Loss, *Securities Regulation* 1104 (1983).

The first *Cort* factor apparently is a codification of the statutory tort doctrine:

When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing court action.

Restatement (Second) of Torts § 874A (1979). The significance of this criterion is displayed in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), where the Court found an implied right of action to enforce Title IX's prohibition against sex discrimination in educational institutions receiving federal financial assistance. The Court held that since Title IX explicitly conferred a benefit upon victims of sex discrimination, the ambiguous legislative history of Title IX did not militate against the implication of a private right of action. In contrast to *Cannon,* the Court in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), denied a private right of action to enforce Section 17(a) of the 1934 securities act despite the past implication of private rights of action under Section 10(b) and 14(a) of the 1934 Act. Significantly, the Court found that Section 17(a) of the Act does not by its terms confer a right upon any particular class of plaintiffs. Likewise, in *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court refused to

infer a private right of action for damages under Section 206 of the Investment Advisors Act, which provides as follows:

It shall be unlawful for any investment advisor, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

(3) ... knowingly to sell any security or purchase any security from a client ... without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction....

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative ....

15 U.S.C. § 80b–6. In *Lewis,* the Court stated that "the mere fact that the statute was designed to protect advisors' clients does not require the implication of a private cause of action for damages on their behalf," 444 U.S. at 24, 100 S.Ct. at 249, and focused on the elaborate framework of administrative judicial vehicles for the enforcement of this section, concluding: "In view of these express provisions ... it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action.'" *Id.* at 20, 100 S.Ct. at 247 (citation omitted).

The juxtaposition of Section 4c with Section 4b displays that plaintiff herein is not singled out as one of a class of identifiable beneficiaries for whose "especial benefit the statute was enacted." *Cort,* 422 U.S. at 78, 95 S.Ct. at 2088. Section 4c rather merely makes unlawful certain specious or meretricious transactions. Indeed, the syntax or formal structure of Section 4c is similar to that statute in *Lewis* which was found not to imply a private right of action. In contrast, Title IX has an "unmistakeable focus on the benefited class." *Cannon,* 441 U.S.

at 691, 99 S.Ct. at 1955. Moreover, the entire history of commodities regulation, in contrast to securities regulation, suggests that insuring the integrity of the market system, rather than merely protecting individual customers, has been the motivating force behind congressional legislation. 1 *Securities Fraud & Commodities Fraud,* at 82.363. Therefore, in evaluating Section 4c under the first *Cort* factor, the court concludes that Section 4c of the CEA does not entail an especial benefit to plaintiff.

The second prong of the *Cort* analysis, and perhaps the most dispositive, inquires as to whether there is any indication of legislative intent, explicit or implicit, either to create or deny an implied right of action. 422 U.S. at 78, 95 S.Ct. at 2088. As was stated in *Curran:*

In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at the time the legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the preexisting remedy.

*Curran,* 102 S.Ct. at 1839. While the split on the Court in *Curran* was based not on implied-action analyses but on conflicting readings of legislative history and differing assessments of the importance Congress attached to existing case law, it is apparent from *Curran* that the contemporary legal context out of which the statute was legislated is a significant concern of all the justices. As the majority stated:

In view of the absence of any dispute about the proposition prior to the decision of *Cort v. Ash* in 1975, it is abundantly clear that an implied cause of action under the CEA was part of the "contemporary legal context" in which Congress legislated in 1974. (Citation omitted). In that context, the fact that a comprehensive reexamination and significant amendment of the CEA left intact the statutory provisions under which the federal courts had implied a cause of action is itself evidence that Congress affirmatively intended to preserve that remedy. 102 S.Ct. at 1841 (footnote omitted).

No such contemporary legal context exists with respect to Section 4c. In other words, no comparable congressional approval or acquiescence exists with respect to this section of the CEA. Indeed, one district court, two years prior to the decision in *Curran,* and in a circuit which held that private individuals could sue to enforce the anti-fraud provisions of the Act, held that subsections (b) and (c) of Section 4c do not imply a private right of action. *Stone v. Saxon & Windsor Group, Ltd.,* 485 F.Supp. 1212 (N.D.Ill.1980).

In summary, Section 4c of the CEA does not provide such a history of case law that is present in Section 4b so as to conclude that *Curran* is controlling. Finding neither that plaintiff is one of the class for whose especial benefit Section 4c was enacted nor any indication of legislative intent to create such a remedy, this court refuses to imply a right of action under Section 4c of the CEA. This decision is a function both of the *Cort v. Ash* analysis and recent decisions of the Supreme Court, which have generally limited the availability of implied causes of action. *See generally,* Stewart & Sunstein, *Public Programs and Private Rights,* 95 Harv.L.Rev. 1193, 1304–05 (1982) (The commentators note that the Supreme Court's reluctance to find implied actions is of recent origin. Cases before 1970 generally sanctioned private actions, notwithstanding congressional silence or ambiguity, when civil liability was appropriate to effectuate a statute's purpose.). *Compare*

*Cort v. Ash, supra, with Texas & Pacific Railway Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916).

Accordingly, defendants' motion to dismiss Count VII for failure to state a claim upon which relief can be granted on the ground that no private right of action exists under that section of the CEA is GRANTED.

**V.**

Defendant Anthony Giarletta (Giarletta) is a resident of the State of New York, whose business address is in that state. Amended Complaint, ¶ 10. Defendant has lived in the State of New York since at least December of 1972. Affidavit of Giarletta, ¶ 1. This defendant has never worked, lived, or resided in Georgia, has never owned or rented any real property in Georgia, and at no time since this defendant has been employed or has been a limited partner in Bear Stearns has he been to Georgia. *Id.,* ¶ 4. He now moves, pursuant to Fed.R.Civ.P. 12(b)(2), to dismiss all counts and claims as against him individually. Accordingly, the question presented is whether defendant Giarletta is subject to the personal jurisdiction of this court.

Initially, the court notes that jurisdiction is alleged in this action pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. This section provides that "process ... may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found," and permits service in a foreign country. As such, given the nationwide service of process under Section 27, the necessary nexus as to personal jurisdiction must be found between the United States and the defendant. In other words, while a defendant may not be called upon to defend in a particular tribunal unless he has had "minimal contacts" with the state which would exercise jurisdiction over him, *Hanson v. Denckla,* 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958), here it is not the State of Georgia but the United States which would exercise its jurisdiction. *See Garner v. Enright,* 71 F.R.D. 656, 660

(E.D.N.Y.1976). As a leading treatise has stated:

> The principles of *International Shoe* are grounded upon concepts of territorial limitations on the power of the respective states to subject non-residents to the jurisdiction of their courts. Accordingly, in federal question litigation where Congress has provided for nationwide service of process, there is no due process requirement of "minimal contacts" to justify the exercise of jurisdiction by the federal courts.

2 J. Moore & J. Lucas, *Moore's Federal Practice,* ¶ 4.25[5] (2d Ed. 1981). "And plainly, where, as here, the defendants reside within the territorial boundaries of the United States, the 'minimal contacts,' required to justify the federal government's exercise of power over them, are present. Indeed, the 'minimal contacts' principle does not, ... seem particularly relevant in evaluating the constitutionality of *in personam* jurisdiction based on nationwide ... service of process." *Mariash v. Morrill,* 496 F.2d 1138, 1143 (2d Cir.1974). *Accord, Fitzsimmons v. Barton,* 589 F.2d 330 (7th Cir. 1979). Therefore, the court concludes that personal jurisdiction over defendant Giarletta is satisfied pursuant to Section 27 of the Securities Exchange Act, inasmuch as this defendant is a resident of the United States. Furthermore, this court concludes that the nationwide service of process provided in the Act is sufficient to support *in personam* jurisdiction over defendant Giarletta for the purpose of holding him to answer the pendent or ancillary non-federal claims presented. *See Murphey v. Hillwood Villa Associates,* 411 F.Supp. 287, 293 (S.D. N.Y.1976); *Emerson v. Falcon Manufacturing, Inc.,* 333 F.Supp. 888 (S.D.Tex.1971). *See generally,* Annot., 8 ALR Fed. 511 (1971).

Accordingly, defendant Giarletta's motion to dismiss all counts and claims against him individually, pursuant to Fed.R.Civ.P. 12(b)(2), on the ground that he is not subject to the personal jurisdiction of this court, is DENIED.

## VI.

In Count XI, plaintiff alleges a violation of RICO. Specifically, plaintiff avers the following. Defendants have engaged in fraudulent practices, on one or more occasions, in the purchase and sale of securities and commodities during the last ten years. Amended Complaint, ¶ 127. Defendants participated in, aided and abetted, or conspired among themselves to conduct unlawfully affairs through a pattern of racketeering activity in the pursuit of business enterprises and affairs in interstate commerce. *Id.,* ¶ 129. As a proximate result of the conduct of defendant Paine Webber, defendant Bear Stearns, and defendant Bowman, plaintiff has been damaged. *Id.,* ¶¶ 130–32.

Defendants advance several arguments in support of their contention that plaintiff's RICO claim fails to state a claim upon which relief can be granted, including the argument that plaintiff's failure to allege that defendants are associated with organized crime is fatal to his RICO claim. While the court specifically rejects this argument, the court concludes that plaintiff's claim under RICO must be dismissed.

### THE STRUCTURE OF RICO

The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, Title IX of the Organized Crime Control Act, Pub.L. No. 91–452, 84 Stat. 922 (1970), seeks to halt organized crime's infiltration of the American economy by creating sanctions and remedies against defendants who engage in racketeering activity to operate or gain control of business enterprises. *Id.,* 84 Stat. at 923 (Statement of Findings and Purpose). Section 1964(c) provides for a private right of action for treble damages:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). Section 1962 makes it unlawful to invest funds derived from a pattern of racketeering activity in an enterprise engaged in interstate commerce, to operate or acquire an interest in any such enterprise through a pattern of racketeering activity, to conduct or participate through a pattern of racketeering activity in the affairs in any such enterprise, or to conspire to violate any of these provisions. *Id.,* § 1962(a)–(d). "Racketeering activity" includes any offense involving fraud in the sale of securities. *Id.,* § 1961(1)(D). A "pattern" consists of two or more such acts committed within ten years of each other. *Id.,* § 1961(5).

■ A. The seminal case which held that a plaintiff in a civil RICO action must prove the defendant's affiliation with organized crime is *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109 (S.D.N.Y.1975). In *Barr,* the district court refused to allow plaintiffs to amend their complaint against a telephone answering service to include a RICO claim predicated on the mailing of fraudulent bills unless they showed the defendant's membership in "a society of criminals operating outside of the law." *Id.* at 113. Several courts have followed *Barr's* reading of a requirement of affiliation with organized crime into the statute. *See, e.g., Moss v. Morgan Stanley Inc.,* 553 F.Supp. 1347, 1361 (S.D.N.Y.1983); *Wagner v. Bear Stearns & Co.* [1982–83 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 99,032 (N.D.Ill. Sept. 17, 1982) (RICO not intended "to supplant existing federal regulations of securities fraud, at least in the absence of any alleged involvement of organized crime as that term is commonly used and understood."); *Waterman Steamship Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 260 (E.D. La.1981); *Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736, 747 (N.D.Ill. 1981). Several courts, however, have rejected the reading of such a requirement into the statute or declined specifically to follow *Barr. See, e.g., Schacht v. Brown,* 711 F.2d 1343 (7th Cir.1983) ("We agree that the civil sanctions provided under RICO are dramatic, and will have a vast impact on the federal-state division of sub-

stantive responsibility for addressing illegal conduct, but, like most courts who have considered this issue, we believe that such dramatic consequences are necessary incidents of the deliberately broad swath Congress chose to cut in order to reach the evil it sought; we are therefore without authority to restrict the application of the statute."); *Hanna Mining Co. v. Norcen Energy Resources Ltd.,* 574 F.Supp. 1172 [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,742 (N.D.Ohio June 11, 1982).

While the requirement of an affiliation with organized crime may appear to follow from the title of the provisions and the Act that contains them, and to result from the potential publicity that RICO actions attract and the consequent damage to a defendant's reputation, *see Barr,* 66 F.R.D. at 112–13 (court expresses concern about the "patently unfair" implication "that defendant is somehow involved in organized crime" that could arise from "[t]he mere granting of leave to file a [RICO] claim"), this court believes that the creation of an "organized crime" nexus requirement is improper. First, several representatives expressed fear that any attempt to define the concept of "organized crime" with precision would cast doubt on the statute's constitutionality. 116 Cong.Rec. 35, 293 (1970) (statement of Rep. Poff); *id.,* at 35, 343–44 (statement of Rep. Cellar). While Representative Biaggi proposed an amendment that would have specifically criminalized membership in the Mafia or La Cosa Nostra, Congress rejected it. *Id.,* at 35, 346.

Second, Congress did not want to reduce RICO's potency by imposing a burden of proof that would be practically impossible to meet. *See, e.g.,* 116 Cong.Rec. 586 (1970) (statement of Sen. McClellan) (organized criminals able to "insulate" themselves); *id.,* at 601 (statement of Sen. Hruska) (difficulty in proving link between criminal group members and illicit activities they sponsor). In responding to criticism that RICO's provisions were over-inclusive, Senator McClellan, one of the sponsors of the bill, stated, "the Senate report does not claim . . . that the listed offenses are com-

mitted primarily by members of organized crime, only that those offenses are characteristic of organized crime." McClellan, *The Organized Crime Act (S. 30) or its Critics: Which Threatens Civil Liberties?,* 46 Notre Dame Law. 55, 142 (1972), *cited in* Note, *Civil RICO: The Temptations and Impropriety of Judicial Restrictions,* 95 Harv.L.Rev. 1101, 1109 n. 47 (1982) (hereinafter cited as *Civil RICO* ).

Finally, a "court's preoccupation with possible implications of links to organized crime is self-fulfilling; RICO claims can stigmatize defendants only, if courts restrict the applicability of the broad statutory language to proven organized criminals." *Civil RICO,* 95 Harv.L.Rev. at 1107.

Therefore, inasmuch as Congress explicitly rejected an affiliation with organized crime requirement as unworkable and possibly unconstitutional, and inasmuch as Congress has given statutory content to the notion of "organized crime" by utilizing a "pattern of racketeering activity" predicate for section 1962 violations, the court rejects defendants' argument that plaintiff's failure to allege that defendants are associated with organized crime is fatal to plaintiff's RICO claim.

■ B. There are eight elements which must be pled before a plaintiff may avail himself of the enhanced damage and attorney's fee provision of RICO. These elements are as follows:

(1) That the defendant

(2) through the commission of two of the enumerated predicate acts,

(3) which constitute a "pattern" of

(4) "racketeering activity,"

(5) directly or indirectly participates in the conduct of

(6) an "enterprise,"

(7) the activities of which affect interstate or foreign commerce, and that

(8) plaintiff was injured in his business or property by reason of such conduct.

*Moss v. Morgan Stanley Inc.,* 719 F.2d 5, No. 1281 (2d Cir. Sept. 9, 1983).

■ RICO has not been around long enough for rule makers to address it specifi-cally. It seems, however, to this court at least that there are many sound reasons for requiring that, like fraud, it must be pled with particularity. First, the mere invocation of the statute has such an *in terrorem* effect that it would be unconscionable to allow it to linger in a suit and generate suspicion and unfavorable opinion of the putative defendant unless there is some articulable factual basis which, if true, would warrant recovery under the statute. Second, the concepts within the statute are so nebulous that if the cause of action were only generally pled, a defendant would have no effective notice of a claim showing that the pleader is entitled to relief. Fed.R. Civ.P. 8(a)(2). Therefore, the court believes that it is appropriate to require that RICO be pled with the same particularity that is required in the pleading of fraud. Fed.R. Civ.P. 9(b). *See Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972). *See generally* 5 C. Wright & A. Miller, Federal Practice & Procedure § 1296 (1969). Because of the nature of the charge, the court should neither assume without inquiry that the tenets of Rule 11 of the Federal Rules of Civil Procedure have been honored, nor accept the allegations made on information and belief. *See* 2A J. Moore & J. Lucas, *Moore's Federal Practice,* ¶ 9.03 at 9–26 (1983). A complaint alleging RICO, like a complaint alleging fraud, should be filed only after a wrong is reasonably believed to have occurred. It should be a vehicle to right a wrong, not to find one. *See Segal,* 467 F.2d at 607–08.

Further, it is noted that the predicate acts must be criminal acts. 18 U.S.C. § 1961(1). Characterizing some event as criminal does not make it so. An "offense" must be well founded and based upon probable cause. Unless the sufficient facts are alleged by either showing previous convictions or setting out probable cause, neither the defendant nor the court can ascertain what prior conduct is said to constitute a predicate act; nor can the defendant or the court determine whether a predicate act has been committed. Therefore, it is necessary that either a prior conviction or probable

cause be alleged with reference to the predicate acts. *Bache, Halsey, Stuart, Shields, Inc. v. Tracy Collins Bank & Trust Co.,* 558 F.Supp. 1042, 1045 (D.Utah 1983). Even where other counts of the complaints allege the predicate acts, adoption by reference is not advisable. *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391, 396 (S.D.N.Y.1982).

 These principles will be applied in reviewing the sufficiency of the pleadings in the case at bar. It is not at all clear who the defendants are in the RICO count. The only ones mentioned specifically in the counts are Paine Webber, Bear Stearns and Bowman. Giarletta and Hudson are not named in the count, although they are mentioned in the counts which are adopted by reference.

The plaintiff adopts by reference Count I, alleging fraud in the sale of securities while Bowman was employed first at Paine Webber and then at Bear Stearns. He also adopts by reference Count VI, alleging fraud in connection with the sale of commodities. If the purpose of the adoption was to allege predicate offenses, the most generous characterization is that he has alleged one offense as to Bowman or one offense with Bowman and Paine Webber, and another with Bowman and Bear Stearns. Count VI does not allege an offense involving fraud in the sale of *securities* or any other offense enumerated in 18 U.S.C. § 1961. Next, plaintiff alleges on information and belief that "Paine Webber, Bear Stearns and Bowman have engaged in fraudulent practices on one or more occasions, in the purchase and sale of securities and commodities during the last ten years." Amended Complaint, ¶ 127. This will not do for the reasons stated.

Plaintiff finally alleges that the two brokerage firms and Bowman participated in and conspired to conduct the affairs "of business enterprises and affairs in interstate commerce" through a pattern of racketeering activity. (Emphasis added). Assuming without deciding that this is sufficient to allege these two elements, the court notices that here the plaintiff comes no closer than this to defining the enterprise. In his brief, by hyperbole, he contends that the complaint "clearly" alleges the existence of two enterprises—(i) Paine Webber, Hudson and Bowman and, (ii) Bear Stearns, Giarletta, and Bowman. Accepting this assertion, the court cannot, even under the most generous interpretation, find but one predicate act for each enterprise. Accordingly, the complaint fails to state a claim in this count upon which relief may be granted. Also, contrary to his brief, he does not identify the enterprise.

The court in this case, as it should in any case, will of course consider a motion for attorney's fees under 28 U.S.C. § 1927 or for sanctions under Fed.R.Civ.P. 11, if it can be shown that at the time of the filing of the amended complaint the attorneys for the plaintiff who signed the complaint did not have a good ground to believe that the relief requested was warranted under the then known facts. *See also* Code of Professional Responsibility DR7–102(A)(1), (2) (1979).

## CONCLUSION

Defendants' motions to dismiss, pursuant to Rule 12(b) are hereby GRANTED IN PART and DENIED IN PART. Specifically, the court concludes the following:

(a) Plaintiff's claims under Section 10(b) and Rule 10b–5, Counts I and II, shall not be dismissed for failure to state a claim upon which relief can be granted, on the grounds that (i) the claims are not barred by the applicable statute of limitations, and (ii) the accounts upon which plaintiff bases his claims constitute "securities" within the meaning of *Howey;*

(b) Plaintiff's claims under Section 10 of the Fair Business Practices Act of 1975, Count V, shall be dismissed, on the ground that the claims are not cognizable under the terms of the Act;

(c) Plaintiff's claims under the Commodity Exchange Act shall not be dismissed on the ground that they are barred by the applicable statute of limitations;

(d) Plaintiff's claim pursuant to Section 4c of the Commodity Exchange Act, Count VII, fails to state a claim upon which relief can be granted, since there is no implied right of action under that section;

(e) Plaintiff's claims against defendant Giarletta shall not be dismissed on the ground that he is not subject to the personal jurisdiction of this court; and

(f) Plaintiff's claim under RICO, Count XI, shall be dismissed for failure to plead with particularity.