Daniel F. McCARTHY, etc., Plaintiff,

v.

PAINEWEBBER, INC., et al., Defendants.

No. 85 C 03328.

United States District Court, N.D. Illinois, E.D.

Sept. 11, 1985.

**934**

Arthur M. Holtzman, Pederson & Houpt, Chicago, for plaintiff.

James D. Adducci, Michael B. Roche, Schuyler, Roche & Zwirner, Chicago, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Daniel McCarthy ("McCarthy") sues Paine·Webber, Inc. ("PaineWebber") and Paine Webber Account Executive Thomas Downs ("Downs") under Commodity Exchange Act ("Act") § 4b(A) ("Section 4b(A)"), 7 U.S.C. § 6b(A) (actionable under Act § 22(a)(1), 7 U.S.C. § 25(a)(1)), seeking damages for harm suffered as a result of defendants' allegedly fraudulent mismanagement of his commodities account. McCarthy's Amended Complaint (the "Complaint")[1] also includes two pendent state law counts, one seeking recovery for common law fraud and the other under the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act"), Ill.Rev.Stat. ch. 121½, §§ 261–272.

Defendants now move to dismiss McCarthy's Complaint under Fed.R.Civ.P. ("Rule") 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons stated in this memorandum opinion and order, defendants' motion is granted in part and denied in part.

### Facts [2]

McCarthy, the sole proprietor of McCarthy Cattle Company ("Company"), was ap-

---

1. McCarthy's original complaint included claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"). This Court's sua sponte April 11, 1985 memorandum opinion and order dismissed the RICO claims without prejudice. Next defendants filed their May 21 motion to dismiss. From the bench this Court (a) denied that motion in part, (b) granted McCarthy leave to amend his original complaint (an absolute right McCarthy had under Fed.R.Civ.P. 15(a) in any event) and (c) ordered briefing on the motion's surviving elements. Defendants filed

their supporting memorandum June 20, focusing on the language of the original complaint. On July 9 McCarthy responded with a memorandum and the Complaint. Defendants' July 15 reply afforded them ample opportunity to address any issues raised for the first time by the Complaint—an opportunity defendants did not hesitate to take.

2. As always with respect to a motion to dismiss, the well-pleaded factual allegations of the Complaint are taken as true, with all reasonable factual inferences drawn in McCarthy's favor.

proached by Downs in 1982 about the possibility of trading in live and feeder cattle futures on the commodities market. Downs told McCarthy he had developed a system for preparing monthly estimates before the release of the United States Department of Agriculture's Cattle and Feed Report, explaining he traded for both Ralston Purina and the Oscar Meyer Company. McCarthy expressed some interest in commodities trading, but he told Downs the banks and production credit associations providing Company with financing had limited his futures trading on Company's behalf to legitimate hedge positions for the live and feeder cattle Company owned. McCarthy emphasized Company was forbidden from going long (buying futures) in live cattle without first obtaining specific approval from the production credit associations. McCarthy added he personally would consider entering into a few speculative trades from time to time, provided they involved no more than two or three contracts.

On the basis of those representations McCarthy opened an account with Paine-Webber in Company's name July 27, 1982, executing a commodity hedge letter and a commodity authorization letter. On signing the hedge letter, McCarthy stressed to Downs that trading on Company's account was limited to legitimate hedge transactions. Downs also agreed he would make trades on the account only with prior authorization, either specific or in the form of an agreed-upon trading strategy.

Relying on Downs' representation of an opportunity for profit with little risk, McCarthy sold April 1983 live cattle and feeder cattle futures on several dates in late December 1982 and early January 1983. Once the trades had been made McCarthy told Downs the prices obtained were not profitable for Company, so he did not want to hold the short positions for very long. Downs assured McCarthy prices would fall in January and the posi-

tions could then be offset at a profit. Profits did fall slightly on various dates in January (compare Complaint ¶ 13 with Complaint Ex. A) but Downs did not buy out the short positions, later telling McCarthy he "froze." Though prices rose through February and March, Downs continued to hold the positions, telling McCarthy on at least two occasions that the market would soon break so as to allow profitable offsets. Defendants finally offset the positions on March 24, 29 and 30 at a loss to McCarthy of nearly $230,000, including over $5,000 in commissions.

Throughout March Downs continued to trade on Company's account. By the end of the month 416 trades had been made on the account, generating commissions totaling $11,000 and yielding losses (including commissions) of over $38,000. At some point before April 13 Downs also bought long positions in April cattle that he failed to offset with corresponding short positions, against McCarthy's instructions that he never wanted to be in a position of having to take delivery on futures contracts. As a result of Downs' failure to respect his wishes, McCarthy was required to take delivery in Sioux City, Iowa on April 13 of seven loads (each at 40,000 pounds) of live beef cattle. McCarthy incurred a loss of approximately $7,000.

In May 1983 McCarthy told Downs he was leaving town and there was to be no trading in the account during his absence without his authorization. Before leaving May 26 McCarthy gave Downs dates, places and telephone numbers where he could be reached while he was away. Late on June 7, the day of McCarthy's return, Downs called to say he had to see McCarthy that evening. They met in McCarthy's office, and Downs revealed that on May 27 and June 1 he had sold 56 futures contracts for June 1983 cattle on Company's account at prices ranging from $65.30 to $66.70. He admitted he made no effort to reach McCarthy before taking the short posi-

*Wolfolk v. Rivera,* 729 F.2d 1114, 1116 (7th Cir.1984). That approach, of course, involves

no actual findings of fact.

tions, but he had thought June 1983 contracts would be trading at $62 to $63 before the contracts closed. Because things had not worked out Downs said PaineWebber would take over the short positions. In fact PaineWebber refused to take over the positions, and they were offset June 20 at a loss to McCarthy of over $35,000, including nearly $3,400 in commissions.

## Contentions of Parties

Against that factual background McCarthy asserts various claims, the first five counts being grounded in Section 4b(A) and the other two looking to state law:

1. Count One charges defendants with cheating and defrauding McCarthy in connection with short positions opened in late December 1982 and early January 1983 and finally closed in late March 1983.

2. Count Two claims unauthorized trading in connection with the positions opened on May 27 and June 1, 1983 while McCarthy was out of town.

3. Counts Three and Five charge churning in connection with (a) the trades forming the basis of Count Two and (b) the 416 trades in Company's account during March 1983.

4. Count Four asserts cheating and defrauding that resulted in McCarthy's having to take delivery of live beef cattle in April 1983.

5. Counts Six and Seven advance pendent state law claims (a) for common law fraud and (b) under the Illinois Consumer Fraud Act.

Defendants ask dismissal of Counts One, Four, Six and Seven, claiming:

1. Count One is barred by the two-year limitations period prescribed by Act § 22(c).

2. Both Counts One and Four fail to allege scienter on defendants' part, a necessary element of a Section 4b(A) claim.

3. Count Six fails to allege the elements necessary to state a claim for common law fraud under Illinois law. In any case PaineWebber cannot be liable for punitive damages under Count Six simply on the basis of respondeat superior.

4. Count Seven (under the Illinois Consumer Fraud Act) must be dismissed because that state statute has been preempted by the Act's comprehensive federal scheme regulating commodities trading.

This opinion considers each of those arguments in turn.

## Statute of Limitations

■ Act § 22(c), part of the section that expressly creates a private right of action for Act violations, says:

Any such action must be brought within two years after the date the case of action accrued.

Defendants argue McCarthy's cause of action as to the Count One positions accrued from March 24 to March 30, 1983, the dates those positions were closed out. That would bring the claim (originally sued on April 9, 1985) outside the two-year limitations period.

McCarthy does not challenge the principle underlying defendants' focus on the dates the positions were closed out: "the general proposition that the statute of limitations does not begin to run on a continuing wrong until the wrong is over and done with." *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir.1983). Rather McCarthy argues he did not know of the fraud until at least sometime in April, when he received a statement reflecting the closing out of the positions and the attendant losses. And McCarthy Mem. 3 adds:

It was not really until May and June 1983, when the fraudulent conduct of defendants became so blatant ... that plaintiff realized his account was being mishandled....

But the very allegations in the Complaint belie those arguments.[3] McCarthy knew

---

**3.** It will be recalled McCarthy's cattle business necessarily made him familiar with the mechanics of live and feeder cattle futures trading (see Complaint ¶¶ 8–9). This is not of course to

on March 21 (confirming like knowledge he had earlier) (1) Downs continued to hold the positions open and (2) given market prices, they could be offset only at a loss. Moreover he knew the April 1983 positions had to be closed out promptly if he was not to be in the position of having to close on the contracts. Finally, he knew Downs had been far less than forthright in his handling of the matter. Even if McCarthy did not know the precise date on which the positions were closed out until sometime in April, he was very much aware that such an event was imminent in late March. Given that awareness, there is no reason for looking beyond the actual end-of-March dates on which the positions were closed out to determine when the Count One cause of action accrued. Before those dates McCarthy was certainly on notice (1) that the transaction had not worked out as planned and (2) that Downs was likely to blame for the debacle. That knowledge of a potential claim was enough to trigger a duty of inquiry and to start the limitations period running, even if McCarthy did not yet know the full particulars of how the wrong was committed. *See Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir.1985).

Much the same reasons require rejection of McCarthy's claim the running of the limitations period was tolled under the fraudulent concealment doctrine. *Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir.1975) teaches (citations omitted):

At least two types of fraudulent behavior toll a statutory period.... In the first type, the most common, the fraud goes undiscovered even though the defendant after commission of the wrong does nothing to conceal it and the plaintiff has diligently inquired into its circumstances. The plaintiff's due diligence is essential here.... In the second type the fraud goes undiscovered because the defendant has taken positive steps after commission of the fraud to keep it concealed.... This type of fraudulent concealment tolls

the limitations period until actual discovery by the plaintiff.

McCarthy calls on the first of those principles, adopting the reasoning of *Hupp v. Gray*, 500 F.2d 993, 997 (7th Cir.1974):

While the existence of a fiduciary relationship is, no doubt, one factor which a court should consider in determining whether a plaintiff has exercised due diligence, a mere allegation that such a relationship existed is alone not necessarily determinative. A court should also consider other factors, including the nature of the fraud alleged, the opportunity to discover the fraud and the subsequent actions of defendant.

Defendants, McCarthy contends, were fiduciaries who controlled the information flow to him and who continued to mischaracterize the trading climate.

Of course the existence of a fiduciary relationship is no license to ignore events giving rise to strong suspicion. *Id.* As this opinion has already noted, McCarthy's Complaint acknowledges he knew Downs was not adhering to the pre-established trading scheme and significant losses were a distinct possibility. Moreover McCarthy kept track of the status of the account through January, February and March. True enough, Downs continued to project a market turnaround that would save the day, but the need to draw reasonable pro-McCarthy inferences does not include the strained notion that those projections sufficed to lull him into a false sense of security—particularly in light of his experience with Downs in the first months of 1983. Again, taking the facts as alleged in the Complaint, it is beyond doubt McCarthy was on notice something was potentially amiss at least before the end-of-March–1983 closeout dates—at least enough to trigger inquiry (what *Tomera* and *Hupp* label "due diligence"). It follows McCarthy is not in a position to invoke the fraudulent concealment doctrine.

---

hold him to knowledge of Downs' claimed improprieties, but it does mean McCarthy under-

stood the matters next referred to in the text.

Though McCarthy's cause of action on the Count One claims thus accrued in late March 1983 when the short positions were closed out and he sustained the damages from Downs' conduct, the original complaint was not filed until April 9, 1985. Count One is dismissed as untimely.

### Scienter

■ In view of that disposition of Count One, defendants' scienter argument need be addressed only as to Count Four. In that respect defendants argue:

1. Section 4b(A), which makes it unlawful "to cheat or defraud or attempt to cheat or defraud" another person in connection with a commodities transaction, by its very terms incorporates a scienter element.

2. McCarthy fails to allege conduct with fraudulent intent.

3. Hence he fails to state a claim under Section 4b(A).

McCarthy counters by citing the opinion of the Commodities Futures Trading Commission ("CFTC") in *Gordon v. Shearson Hayden Stone, Inc.*, [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,016, at 23,981 (CFTC 1980), *aff'd sub nom. Shearson Loeb Rhoades, Inc. v. CFTC*, 673 F.2d 1339 (9th Cir.1982) (unpublished decision) for the proposition "that a breach of a fiduciary duty, even if committed negligently, constitutes fraud as proscribed by Section 4b(A) of the Act." McCarthy says defendants' failure to offset certain long positions, which forced McCarthy to take delivery of cattle April 13, 1983, was in clear violation of his instructions about how his account was to be handled, thus breaching the fiduciary obligation an agent owes his principal.

*Gordon's* linchpin is its observation (*id.* at 23,976):

When Congress enacted Section 4b in 1936, the common law concept of "fraud" encompassed both actual and constructive fraud.

Typically courts treat a breach of a fiduciary relationship as an instance of constructive fraud (that is, as a breach of duty held

actionable irrespective of any moral guilt). See 19 I.L.P. *Fraud* § 5, at 558 (1956 & supp.1985), discussing the Illinois law of constructive fraud. *Gordon*, [1980–82 Transfer Binder] at 23,976, noting that Section 4b as a whole applies to persons acting "for or on behalf of" any other person, reasoned:

[W]hen Congress prohibits "fraud" in the context of remedial legislation applicable to fiduciaries, it is presumed that Congress has adopted the flexible legal principles of fraud, including constructive fraud.

That construction of Section 4b(A) has not, on the whole, met with approval in the courts. See, e.g., *McIlroy v. Dittmer*, 732 F.2d 98, 102 (8th Cir.1984); *Crook v. Shearson Loeb Rhoades, Inc.*, 591 F.Supp. 40, 47–48 (N.D.Ind.1983); *Herman v. T. & S. Commodities, Inc.*, 578 F.Supp. 601, 603 (S.D.N.Y.1983); but see *Sall v. G.H. Miller & Co.*, 612 F.Supp. 1499 (D.Colo.1985) (opting to follow *Gordon*). Judicial unwillingness to adopt the *Gordon* analysis must reflect in part its neglect of the basic principle of statutory construction that mandates resort first to the plain language of the statute. Only when those words prove unclear need a court explore the legislative history. See *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring) ("The starting point in every case involving construction of a statute is the language itself").

Certainly *Gordon* did not pause at all over the words of the statute, leaping instead into the subtleties encompassed by the common law concepts of actual and constructive fraud. That delinquency caused it to miss the clear import of what Congress *said*, as set out simply in *McIlroy*, 732 F.2d at 102:

Section 4b(A) prohibits "cheat[ing]," "defraud[ing]," and "attempt[ing] to cheat or defraud." The words of the statute themselves negate any inference that

Congress meant to proscribe unintentional acts under section 4b(A). *See CFTC v. Savage,* 611 F.2d 270, 283 (9th Cir.1979) ("to be charged with a violation of 4b(A) [one] must have known that he was cheating"); *Master Commodities, Inc. v. Texas Cattle Management,* 586 F.2d 1352, 1355–56 (10th Cir.1978) (section 4b "seems clearly aimed at intentionally deceptive conduct"). Indeed, the words "cheat" and "defraud" themselves imply a degree of intentionality that would probably render the inclusion of "willfully" in section 4b(A) superfluous.

In fact, ordinary English usage does not impart to the transitive verb "defraud" the less active notions of malfeasance encompassed by the concept of "constructive fraud." Just as "quasi-contract" is a shorthand phrase for something that is not really a contract, connoting instead the law's imparting of some contract-like consequences to a different legal relationship, so "constructive fraud" does *not* describe truly fraudulent conduct. Thus while an individual who simply breaches a fiduciary obligation may well be subjected to the consequences of what the law terms "constructive fraud," it does not sit well on the tongue to say he has "defrauded" the party to whom the obligation is owed.

In any event, it is most unlikely Congress would have relied merely on the word "defraud" if it really aimed to import into Section 4b(A) the common law doctrine of constructive fraud. At the least one would expect to find in the legislative history some mention of the distinction between actual and constructive fraud, particularly because (1) Section 4b otherwise emphasizes that the conduct it proscribes must be undertaken willfully and (2) the most common usages of the verbs "cheat" and "defraud" themselves suggest intentionality.[4] Yet *Gordon,* [1980–82 Transfer Binder] at 23,977–79 uncovered no such discussion in the legislative history.

*Gordon's* analysis of the legislative history (*id.* at 23,978) is substantially misguided, focusing as it does on the fact Congress adopted Section 4b(A) as written, rather than the following proposed language that would have made it unlawful:

> knowingly and with intent to defraud any person, to fail truly, fully, and correctly to account to such person, or to cheat or defraud or attempt to cheat or defraud any person in any manner whatsoever, ....

*Gordon* would have it the striking of the first clause from the statute as enacted indicates Congress meant to exclude scienter as a necessary element of a Section 4b(A) violation. It seems clear, however, that clause was omitted simply because the proscription it embodied was substantially encompassed by Section 4b(B) of the statute as enacted, which prohibits the making of "any false report or statement" concerning a commodities transaction.[5]

---

**4.** Black's Law Dictionary (5th ed. 1979) defines both terms:

**Cheat,** v. To deceive and defraud. It necessarily implies a fraudulent intent. The words "cheat and defraud" usually mean to induce a person to part with the possession of property by reason of intentionally false representations relied and acted upon by such person to his harm. They include not only the crime of false pretenses, but also all civil frauds, and include all tricks, devices, artifices, or deceptions used to deprive another of property or other right.

**Defraud.** To make a misrepresentation of an existing material fact, knowing it to be false or making it recklessly without regard to whether it is true or false, intending one to rely and under circumstances in which such person does rely to his damage. To practice

fraud; to cheat or trick. To deprive a person of property or any interest, estate, or right by fraud, deceit, or artifice.

**5.** Obviously the first phrase of the earlier proposal did not attach to *both* infinitive clauses—it would make no sense to engage in a redundancy by saying "knowingly and with intent to defraud any person, ... to cheat or defraud or attempt to cheat or defraud any person in any manner whatsoever." Even apart from the oddity of that locution, it should be noted the language elided in that quotation spoke of "such person" (indicating a reference back to the antecedent "any person"), while the "cheat or defraud" clause refers to "any person" (indicating a self-contained provision, rather than a reference back to the earlier "any person"). Thus the sensible reading of the initial proposal was that it embraced two separate prohibitions:

Finally *Gordon*'s argument from statutory structure is unpersuasive. It notes (*id.* at 23,977) Act §§ 4b(B), (C) and (D):

> make it unlawful *"willfully* to make or cause to be made...any false report or statement ..." (Section 4b(B) ); *"willfully* to deceive or attempt to deceive .:." (Section 4b(C) ); and *"willfully* and *knowingly* to take, without consent, the opposite side of a customer's trades (Section 4b(D) ). (Emphasis added).

But the verbs used in those subsections do not of themselves import intentionality as clearly as do "cheat" and "defraud." In fact the argument from structure runs quite the other way. As the preceding text and n. 5 of this opinion have already suggested (and as the previously-quoted *McIlroy* excerpt does as well), the use of the term "willfully" elsewhere in Section 4b only highlights the element of intentionality implicit in Section 4b(A) and lends weight to the conclusion Congress meant to require a showing of scienter in that context as well.

This conclusion (that Section 4b(A) includes a scienter requirement) calls for a look at the scope of scienter: Does it encompass only intentional conduct, or reckless conduct too? Defendants' R.Mem. 9 appears to concede the latter in quoting *McCurnin v. Kohlmeyer & Co.,* 347 F.Supp. 573, 576 (E.D.La.1972), *aff'd,* 477 F.2d 113 (5th Cir.1973):

> The [Act] does not use sweeping terms. Its pejoratives are simple and pointed: it uses the words "cheat" and "defraud" and "wilfully." By any definition these connote deliberate acts or a degree of negligence that is so gross as to approach wilfulness.

That view seems sound. Elements of the *Gordon* analysis of legislative history, though unpersuasive in eliminating scienter

as an element of a Section 4b(A) violation, do justify extending the proscription to reckless conduct. After all the Act was meant "to insure fair practice and honest dealing on the commodities exchanges." H.Rep. No. 421, 74th Cong., 1st Sess. 1, 5, 12 (1935), quoted in *Gordon,* [1980–82 Transfer Binder] at 23,979. In addition the Act was motivated by the conviction that "[c]ertain trade practices involving the cheating of customers ... must be dealt with more adequately than is possible under the present law." S.Rep. No. 1431, 74th Cong., 1st Sess. 3 (1935), also quoted on the same page of the *Gordon* opinion. It seems likely, then, Congress intended Section 4b(A) to proscribe reckless conduct. See *First Commodity Corp. of Boston v. CFTC,* 676 F.2d 1, 6–7 (1st Cir.1982).

Another analogy fortifies that conclusion: the parallel of the securities laws. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976), construing Securities Exchange Act of 1934 § 10(b) ("Section 10(b)"), 15 U.S.C. § 78j(b), concluded the phrase "manipulative or deceptive device or contrivance" embodied a scienter requirement. While *Hochfelder, id.* at 193–94 n. 12, 96 S.Ct. at 1380–81 n. 12 left open whether Section 10(b) bars reckless as well as knowing or intentional misconduct, the vast majority of appellate courts to address the question have held that it does. See *First Commodity Corp.,* 676 F.2d at 7 and cases there cited. If the phrase "manipulative or deceptive device or contrivance" includes reckless conduct, it would seem "cheat" and "defraud" ought to do so too.

■ With the applicable standards thus buttoned down, it is time to return to the allegations of Complaint Count Four. McCarthy does not in terms claim intentional or reckless misconduct on defend-

---

1. "knowingly and with intent to defraud any person, to fail truly, fully, and correctly to account to such person" (so that an innocently mistaken accounting would not fall afoul of the Act); or

2. "to cheat or defraud or attempt to cheat or defraud any person in any manner whatsoever."

Consequently normal draftsmanship principles, coupled with the normal meaning of language, strongly suggest *each* of those separate prohibitions incorporated a scienter requirement, the first by use of the "intent to defraud" language and the second because scienter is within the conventional meaning of "cheat or defraud."

ants' part in connection with Downs' failure to close out the long positions before the closing of the contracts. But Complaint ¶ 30 alleges "gross mishandling" of his account because (Complaint ¶ 29):

> Downs and Painewebber [sic] knew that McCarthy did not want a long (buy) futures contract ever to come due without the entry of a corresponding offset position. If a long position were to come due, McCarthy could be required to take delivery of the commodity.

On that set of allegations McCarthy may perhaps prove defendants were at least reckless in their handling of the long positions. Under the liberal standard enunciated in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) and recently reaffirmed in *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984), that is enough for Count IV to survive defendants' Rule 12(b)(6) motion.

### *Common Law Fraud* [6]

■ Defendants urge Count Six must be dismissed because Counts One through Five do not sufficiently allege the first of the five elements of a common law fraud claim (*Trautman v. Knights of Columbus,* 121 Ill.App.3d 911, 914, 77 Ill.Dec. 294, 296, 460 N.E.2d 350, 352 (1st Dist.1984)):

> (1) a false representation of material facts as opposed to opinion; (2) made by one who knew or believed the representation to be untrue; (3) made to a party who had a right to rely on the representation and, in fact, did so; (4) made for the purpose of inducing the other party to act, or to refrain from acting; and (5) that led to injury to the person who relied on it.

According to defendants, the misrepresentations alleged in Count One through Five

involved at best future conduct. As Defendants' Mem. 9–10 said as to Count One:

> [Count One] also alleges that Downs made predictions of the future behavior of the commodities market and misrepresented how the defendants *would* handle plaintiff's account. Such predictions of future events are clearly not actionable as fraud under Illinois common law.

But as *Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 334, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977) teaches:

> We concede the general rule denies recovery for fraud based on a false representation of intention or future conduct, but there is a recognized exception where the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud.

Complaint ¶ 34 alleges the existence of such a scheme (incorporating for that purpose the substantive allegations of Counts One through Five).[7] It is not inconceivable that McCarthy could deliver as his Complaint advertises—that he could prove Downs represented his willingness to adhere to a carefully devised trading plan, thereby inducing McCarthy to open an account, yet knowing all along Downs was not going to abide by the plan, whether by engaging in churning, unauthorized trading or other wrongful activity. Such conduct would fall within the *Steinberg* exception. Because McCarthy would certainly be entitled to rely on such a representation and because he has plainly alleged injury, it follows that he has stated a cause of action for common law fraud under the *Conley-Hishon* standard for testing the allegations in the Complaint.

That leaves for consideration, on the common-law fraud claim, PaineWebber's

---

**6.** Because Illinois prescribes a five-year limitations period for common-law fraud claims (Ill. Rev.Stat. ch. 110, ¶ 13–205), the untimeliness of McCarthy's Count I allegations for Section 4b(A) purposes does not bar the common-law claim based on the same facts.

**7.** *Steinberg* marks a real departure from most of the Illinois case law. If read too broadly, its

exception could swallow up the basic rule itself. But in the context of a Rule 12(b)(6) motion, a court should err on the side of sustaining plaintiff's claim, for the difficult line between the general rule and the *Steinberg* exception is necessarily better defined in terms of the actual facts than as a matter of mere pleading.

motion to strike McCarthy's prayer for punitive damages. Illinois law is clear that respondeat superior principles alone will not justify an award of punitive damages against an employer. Rather as *Tolle v. Interstate Systems Truck Lines, Inc.*, 42 Ill.App.3d 771, 773–74, 1 Ill.Dec. 437, 439–40, 356 N.E.2d 625, 626–27 (5th Dist. 1976)(citations omitted) teaches, Illinois has joined the ranks of:

> [o]ther courts [that] have followed a complicity rule whereby the corporate master is liable for punitive damages only when the superior officers order, participate in, or ratify outrageous conduct.

> \*    \*    \*    \*    \*    \*

> The complicity rule, on the other hand, seems consistent with the rationale behind the concept of punitive damages. Either as a basis for punishment or for deterrence of wrongdoers, some deliberate corporate participation should be shown before this sanction is applied.... The complicity analysis will allow punitive damages where the institutional conscience of the corporate master should be aroused while protecting the corporate master from liability for punitive damages when a properly supervised employee acts with requisite circumstances of aggravation.

See also *Mattyasovszky v. West Towns Bus Co.*, 61 Ill.2d 31, 36–37, 330 N.E.2d 509, 512 (1975).

■ At least at this point, the Complaint does not include detailed allegations indicating PaineWebber's complicity with Downs. That is not necessarily fatal, for McCarthy has yet to undertake the discovery necessary to plumb the relationship between Downs and PaineWebber. McCarthy does allege PaineWebber declined to provide help in early 1983, when McCarthy was having trouble reaching Downs about the status of the short positions underlying the Count One claims (Complaint ¶ 7). In addition Complaint ¶ 22 alleges PaineWebber refused to take over the unauthorized positions forming the basis of the Count Two claims. That conduct could be wholly innocent of complicity, but on the other

hand it could betoken either ratification of Downs' handling of the account or a reckless failure to supervise Downs properly. In the latter two events a punitive damages award might be sustained against Paine-Webber under the Illinois complicity rule.

Given the *Conley-Hishon* principle, the prayer will be retained for now. But if the facts develop otherwise in discovery, McCarthy will be expected to withdraw the punitive damages claim.

### Illinois Consumer Fraud Act

■ Finally defendants contend McCarthy's Illinois Consumer Fraud Act claim must be dismissed because that statutory remedy has been preempted by the Act's comprehensive regulatory scheme. Though it is settled the Act does not wholly preempt state common law causes of action, see *Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281, 288 (8th Cir.1984), defendants point to cases such as *W & W Farms, Inc. v. Chartered Systems Corp. of New York*, 542 F.Supp. 56, 59–60 (N.D. Ind.1982), which observed:

> The [Act] gave the [CFTC] exclusive jurisdiction over all accounts and transactions in commodities. 7 U.S.C. § 2. However the same provision granting exclusive jurisdiction also limits jurisdiction by providing that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or States." *Id.* It logically follows that the Act preempts private actions based on federal or state statutory schemes which contemplate agency regulation which would interfere with the [CFTC's] jurisdiction.

See also *Witzel v. Chartered Systems Corp. of New York*, 490 F.Supp. 343, 347 (D.Minn.1980); *Bache Halsey Stuart, Inc. v. Hunsucker*, 38 N.C.App. 414, 248 S.E.2d 567, 570–71 (1978) (utilization of private action under North Carolina unfair trade practices statute could encompass a cause of action in state Attorney General to re-

store money or property, or cancel any contracts obtained in violation of statute).[8]

*Taylor v. Bear Stearns & Co.*, 572 F.Supp. 667, 672–74 (N.D.Ga.1983) reviewed that case law, yet declined to dismiss an action based on the Georgia unfair consumer practices act, even though that statute also contemplates the possibility of suits by state officials. See Rothschild, *A Guide to Georgia's Fair Business Practices Act of 1975*, 10 Ga.L.Rev. 917, 930–34 (1976). *Taylor*, 572 F.Supp. at 674, reasoned the plaintiff had invoked no provision of the Georgia statute inconsistent with the regulatory scheme of the Act. If as discovery proceeded such conflict arose, recovery under the state statute could then be barred.

That approach is persuasive to this Court. There is no logical reason not to permit the range of traditional common law actions to be expanded by state statute, so long as the Act's regulatory scheme is not impaired as a consequence. McCarthy has not specified the precise contours of his claim under the Illinois Consumer Fraud Act, but it is not obvious at this stage that such a claim runs counter to the purposes of the Act.[9] Accordingly defendants' motion to dismiss Count Seven is denied, without prejudice to its renewal later in this litigation should it appear the Illinois statutory claim is at odds with the Act's regulatory scheme.

### Conclusion

Defendants' Rule 12(b)(6) motion is granted as to Count One. It is denied as to Counts Four, Six and Seven subject to the caveats expressed in the body of this opinion. Defendants are ordered to answer all surviving counts of the Complaint on or before September 23, 1985.

---

8. Those holdings reflect the legislative purpose of the Act. As *Kotz v. Bache, Halsey Stuart, Inc.*, 685 F.2d 1204, 1207 (9th Cir.1982) put it:

Congress clearly intended to create a single agency to regulate the field: "the Commission's jurisdiction where applicable, supersedes State as well as Federal *agencies*" and "if any substantive State law *regulating* futures trading was contrary or inconsistent with Federal law, the Federal law would govern."

S.Rep. No. 93–1194, 93d Cong., 2d Sess. 35–36 (1974) (emphasis added.)

9. No such impermissible tension is created by the Illinois statute's provision for recovery of attorneys' fees, see Ill.Rev.Stat. ch. 121½, ¶ 270a(c), while Act § 22 contains no such provision. See *Taylor*, 572 F.Supp. at 672–74 (applying a comparable approach in a different context).